907 So.2d 1 (2005)
STATE of Louisiana
v.
Gregory C. BROWN.
No. 2003-KA-0897.
Supreme Court of Louisiana.
April 12, 2005.
Opinion Granting Rehearing in Part June 29, 2005.
*6 Jelpi P. Picou, New Orleans, G. Ben Cohen, William M. Sothern, for Appellant.
Charles C. Foti, Jr., Attorney General, Douglas P. Moreau, District Attorney, Premila Burns, Monisa L. Thompson, Assistant District Attorneys, for appellee.
JOHNSON, J.
Defendant was convicted in the 19th Judicial District Court, Parish of Baton Rouge, of two counts of first degree murder in violation of La. R.S. 14:30. This is a direct appeal from the aforementioned convictions and sentence of death, pursuant to La. Const. Art. V § 5(D).[1] The principal issues of this appeal involve: 1) whether the trial court's dismissal of defendant's retained counsel undermined defendant's *7 right to counsel, 2) whether the trial court erred in failing to suppress defendant's custodial statements, 3) whether the trial court erred in failing to suppress witness' identification of defendant, 4) whether lack of funding during pre-trial hearings compromised defendant's rights of due process and equal protection, 5) whether evidence presented at trial was sufficient to establish defendant's identity and thereby support his conviction for first degree murder, 6) whether the trial court's acquiescence to "hybrid representation" undermined defendant's right to self-representation, 7) whether defendant proved brain damage or mental defect sufficient to render his execution violative of the Eight Amendment.
After a thorough review, we conclude that none of the assignments of error raised by defendant merit reversal, and therefore, we affirm defendant's convictions and sentence.

FACTS AND PROCEDURAL HISTORY
On October 4, 1998, between 5:15 p.m. and 5:40 p.m., defendant, Gregory C. Brown, along with Jonathan Booth, Bryan Risin, Brian Williams, and Eldrich Thompson engaged in a campaign of terror that culminated with the shooting deaths of William and Ann Gay of Clinton, Louisiana, a small community in East Feliciana Parish.
The group conspired to travel from Baton Rouge to Clinton in a 1984 gray Chevrolet van, registered to defendant, to rob reputed drug dealer, William Moore, commonly known as "Little Man." At approximately 5:15 p.m. the men arrived at a trailer home on Wilson Street, where they believed Little Man resided. Jonathan Booth entered the residence unarmed and encountered Davy Thompson, a correctional guard unrelated to defendant Eldrich Thompson. Booth inquired as to the whereabouts of Little Man, and Thompson informed him that Little Man was not there. Booth exited the trailer, but returned with a handgun and attacked Thompson. A struggle ensued, and during the scuffle Thompson managed to disarm Booth. While Thompson and Booth struggled for control of the weapon, Brown entered and shot Thompson in the thigh. He then inadvertently shot Booth in the upper arm. The five men then fled in Brown's van while the victim, Thompson, stumbled to his mother's home across the road, where his brother called the police.
Brown, Booth, who had been shot in the arm, and the remaining three conspirators, in their haste to escape, were involved in an automobile accident three to four blocks from Thompson's residence on the corner of Bank and Marston Streets. The perpetrators ran a stop sign and their van struck a white Toyota Camry driven by sixty-eight year old Sarah Chaney. With their van now disabled, all five men exited through the windows of the disabled van and fled into a nearby wooded area. Local authorities were informed of the automobile accident and were now in pursuit of the suspects.[2]
Bryan Risin was arrested at 5:29 p.m. at nearby Penny's Car Wash attempting to solicit a ride to Baton Rouge. Meanwhile, Brown, along with Eldrich Thompson and Brian Williams, emerged from the woods *8 on Feliciana Drive. Their first victim was fifty-five year old Ikie Roberts, who lived at 12244 Feliciana Drive, two houses down from murder victims William and Ann Gay.
At approximately 5:30 p.m., Ikie Roberts was in his shed working on a gate for a horse stall. His wife Sharon was inside the house. According to Mr. Roberts' trial testimony, Gregory Brown approached him, shirtless, sweaty, and out of breath and offered to pay him to drive the three men to Baton Rouge. Mr. Roberts testified that he had lived in Clinton his entire life and was therefore familiar with its residents. He further testified that since he did not know the three men offering him "four, five, and then a thousand and then twelve hundred [dollars] to bring them to Baton Rouge," he declined the offer. In response, Eldrich Thompson and Brian Williams attempted to use a rope to tie Mr. Roberts' hands, without much success. While attempting to bind him, the three noticed Mr. Roberts' truck, a 1990 grey Ford diesel pickup, and demanded the keys. Mr. Roberts informed the men that the keys were inside the truck. One of the men attempted to start the truck, but was unable to do so due to unfamiliarity with operating a diesel engine.
Inexplicably, Brown flew into a fit of rage when the truck failed to start and picked up a nearby 16-ounce Craftsman claw hammer. With the assistance of Thompson and Williams, Brown began to beat Mr. Roberts with the hammer. The three tied a rope around their victim's neck, and Thompson and Williams held Roberts down while Brown repeatedly hit him in the head and arms with the hammer. Midway through this assault, Thompson and Williams released their hold on Roberts and proceeded toward his truck, which they were finally able to start. The two entreated the defendant to join them in their escape. Brown ignored his companions and continued his assault on Mr. Roberts. Anxious to escape, Thompson and Williams drove off in Ikie Roberts' truck, leaving Gregory Brown behind.
As a result of the vicious attack he suffered at the hands of the defendant, Mr. Roberts suffered a depressed skull fracture, a concussion, a broken left arm, and a broken left hand. The damage to Ikie Roberts' forearm required surgery and the insertion of a plate and seven screws to repair. Further, defendant's attack was so severe that a portion of Mr. Roberts' right ear was torn off with the claw end of the hammer. Mr. Roberts testified at trial that he spent three days in the hospital as a result of the attack and his left hand is now permanently disabled.
When Brown realized that Thompson and Williams had left him behind on Feliciana Drive, he stopped beating Ikie Roberts and chased after the truck. This gave Mr. Roberts the opportunity to retreat inside his home. He last saw Brown chasing after the truck, running down Feliciana Drive toward the home of Myrtle Roberts, his mother and next door neighbor. Once inside his house, Ikie Roberts told his wife to call 911 and then collapsed. Local authorities received the emergency call from Sharon Roberts at 5:50 p.m. Upon responding to the call for assistance at the Roberts' residence, Lt. Billy Demoss relayed a description of Roberts' truck over the dispatch radio, and the fact that the truck was being driven by two black males. At approximately 6:06 pm, reserve deputy Christopher Charlet, who knew Ikie Roberts and was familiar with his truck, drove toward Plank Road in an effort to apprehend the men who had taken Mr. Roberts' truck. Charlet came upon the truck five to six miles outside of Clinton as Plank Road turned into Highway *9 959. Charlet was driving his personal vehicle and unable to contact authorities via radio, therefore he followed Thompson and Williams until they stopped at a residential area on Highway 958. Charlet instructed a resident to call 911 and apprehended Thompson and Williams without incident. Charlet called Clinton authorities at 6:08 p.m. to inform them that the two suspects were in custody.
Meanwhile, Gregory Brown, unfamiliar with the town of Clinton and stranded on Feliciana Drive, was now desperate for transportation. Brown was last seen by Ikie Roberts approaching the home of eighty-five year old widow Myrtle Roberts. Defendant attempted to steal Mrs. Roberts' green 1991 Ford pickup truck, but was unable to do so because the doors were locked. Brown left a bloody fingerprint on the driver's side door handle; subsequent DNA analysis determined that the print contained both Brown and Ikie Roberts' DNA, and fingerprint analysis determined that the print matched Brown's left ring finger. Unable to break into Myrtle Roberts' truck, Brown kicked in her back door, leaving a muddy shoe print on the back door. A smear of blood on the outside door frame and door knob were subsequently matched to Brown's genetic profile. Once inside, Brown threw the elderly Mrs. Roberts' to the ground, breaking her wrist, and demanded the keys to the truck. Mrs. Roberts was unable to produce the keys, so Brown began to search for them. While Myrtle Roberts lay injured on the floor, Brown rummaged about her house, leaving behind three drops of blood that were later matched to his DNA. Unable to find the keys to the truck, Brown left, pulling a telephone from Mrs. Roberts' living room wall and removing it from the residence. Joyce Lapenas, a friend of the Roberts family, discovered Mrs. Roberts on the floor inside her home minutes after the attack. Myrtle Roberts was taken to the hospital in an emergency response vehicle with her son, Ikie.
His third robbery attempt now frustrated, defendant moved on to the next house on Feliciana Drive, the home of William and Ann Gay. William Gay was 62, and a retiree of Georgia Pacific and Copolymer. Ann, his wife of forty-five years, was 60, and a registered nurse. At the time of their murders, the two had three grown children, and had lived in their two bedroom house at 12286 Feliciana Drive for approximately one year. On the date in question, the Gays were last seen enjoying a drink on their patio while the roast they planned to eat for dinner cooked in the oven.
Jullawne London, an acquaintance of Clinton resident Jonathan Booth, testified that she discovered the injured Booth hiding inside her home on Riley Street between 7:30 p.m. and 8:00 p.m. She attempted to provide him with medical assistance for the gunshot wound he had sustained to his arm. Around 10:00 p.m., Ms. London called Booth's mother and sister and informed them that he had been wounded. They suggested that she call the police, which she did. Booth was apprehended by the Clinton police at Ms. London's apartment, approximately one mile from the scene of the collision with Sarah Chaney.
Between 9:50 p.m. and 10:00 p.m., Baton Rouge Fire Department and City Police responded to reports of a vehicle engulfed in flames in the 1400 block of Emma Street. After extinguishing the fire, officials found two badly burned bodies inside a red 1993 Ford Escort. Detectives at the scene ran the license plate number on the Escort and discovered that the car belonged to William and Ann Gay. When the body in the rear seat was removed, a driver's license belonging to William Gay *10 was taken from the wallet in his pants pocket. The autopsy revealed that William Gay had been shot three times, once in the chest and twice in the abdomen. Ann Gay had been shot twice, once in the neck and once in the abdomen. Both had been shot at close range.
At approximately 10:30 p.m., Baton Rouge police officials contacted their counterparts in Clinton and notified them of the murders of William and Ann Gay. At the time, the Clinton authorities were still investigating the crime spree that had occurred earlier that afternoon. Clinton authorities went to the Gays' residence at 12286 Feliciana Drive and found the garage door open, the door leading from the patio to the kitchen open, an unopened can of beer and an overturned glass of wine on the patio, and the roast burning in the oven. At the time William and Ann Gay's bodies were discovered, Gregory Brown was the only member of the group the police had yet to apprehend. Booth had been found wounded and bleeding in the home of Jullawne London in Clinton, and Risin, Thompson, and Williams had been in the custody of the Clinton police for several hours. The next day, October 5, 1998, Clinton police visited Ikie Roberts in the hospital where he positively identified Gregory Brown as his attacker from a police photo lineup. Mr. Roberts told the investigators that he distinctly remembered that the man who attacked him had only one good eye.
Baton Rouge police obtained a warrant for Gregory Brown's arrest on October 5, 1998, based primarily upon Ikie Roberts' positive identification of the defendant as his attacker and witness statements that he was seen approaching the Gay's residence after leaving the home of Myrtle Roberts. The police checked his primary residence on Bahm Street in Baton Rouge, which he shared with his wife of five months and infant daughter. Officials were unable to apprehend Brown at that time.
On October 6, 1998, two days after the murder, investigators learned that Brown had an alternate residence at 4747 Frey Street in Baton Rouge, and obtained a search warrant for that residence. When the officers arrived, they found the defendant's father and a Pop-A-Lock employee attempting to gain access to a Chevrolet Camaro parked behind the house. Once inside, the officers found the residence virtually empty of its contents. A broom and mop were found in the living room area and the house had been recently sanitized. A neighbor informed investigators that Brown's father had already made two trips to the house and removed items from inside. During their search, officials discovered a trash can sitting on the front porch. Inside the trash can they discovered two pieces of duct tape, a telephone with a smear of blood on the handset which was later determined to match Brown's DNA, and a piece of grey telephone cord that had been cut. The telephone cord was similar in color and consistency to the cord found binding the hands of Ann Gay and in the back seat of the vehicle near the body of William Gay.
On December 23, 1998, a confidential informant contacted Deputy U.S. Marshall Brent Ballard, and informed him that Brown was in the Baton Rouge area to visit his wife and child. The informant stated that Brown was hiding inside a single family, single story white and pink house to the right of 6360 Osborne Street in Baton Rouge. A search warrant was issued later that day, and defendant was arrested inside 6048 Osborne Street. Brown had been a fugitive for 82 days.
On July 22, 1999, an East Baton Rouge Parish grand jury indicted the defendant, Gregory C. Brown, for the October 4, 1998 *11 first degree murders of William and Ann Gay, specifying that the first degree murder charges were based on R.S. 14:30(A)(1) and (3).[3] Jury selection commenced on April 22, 2002.[4] A panel of twelve jurors and two alternates were selected, and on May 1, 2002, Brown's capital trial commenced. On May 6, 2002, the East Baton Rouge Parish jury returned two verdicts of guilty as charged of first degree murder against the defendant, Gregory Brown. The penalty phase commenced on May 7, 2002, and the jury returned two death penalty verdicts that same day.

DISCUSSION
This is a capital case in which all assignments of error are reviewed. This Court has an independent obligation to examine the record for passion, prejudice, or arbitrary factors which may have contributed to the jury's recommendation of death, despite the lack of contemporaneous objection or the failure to brief an argument. State v. Sonnier, 379 So.2d 1336, 1358 (La.1979), appeal after remand, 402 So.2d 650 (La.1981), cert. denied, 463 U.S. 1229, 103 So.2d 3571, 77 L.Ed.2d 1412 (1983); See LSA-C. Cr. P. art. 905.9. Defendant assigns sixty-eight errors as the basis for his appeal before this Court. In this opinion we will treat 29 assignments of error (1-7, 8-14, 15-20, 43-47, 49, 57, 62, 63) and review the sentence to ensure that it is not excessive. The assignments of error not discussed in this opinion do not represent reversible error and are governed by well-settled principles of law. These assignments of error will be reviewed in an unpublished appendix which will comprise part of the official record in this case.

I.
To begin, in assignments of error eight through fourteen, defendant argues that the trial court's rulings systematically undermined his right to counsel. First, defendant contends that the trial court arbitrarily removed his counsel of choice during a hearing where he was not present. Second, defendant alleges that there was no showing of a conflict of interest sufficient to justify the removal of his retained counsel. Finally, Defendant contends that the trial court's dismissal of his retained counsel undermined the voluntary nature of his subsequent invocation of the right to self-representation.
La. Const. art. I, § 13 provides in relevant part: "At each stage of the proceedings, every person is entitled to assistance of counsel of his choice, or appointed by the court if he is indigent and charged with an offense punishable by imprisonment." The Sixth Amendment to the United States Constitution likewise carries such a guarantee.[5] Although the *12 Sixth Amendment primarily guarantees the right to effective counsel, it also includes the right to select and be represented by counsel of choice. Wheat v. United States, 486 U.S. 153, 159, 108 S.Ct. 1692, 1696, 100 L.Ed.2d 140 (1988). However, a criminal defendant's right to the counsel of his choice is not absolute. This Court held in State v. Harper, 381 So.2d 468 (La.1980):
An indigent defendant does not have the right to have a particular attorney appointed to represent him. An indigent's right to choose his counsel only extends so far as to allow the accused to retain the attorney of his choice, if he can manage to do so, but that right is not absolute and cannot be manipulated so as to obstruct orderly procedure in courts and cannot be used to thwart the administration of justice.
Harper, 381 So.2d at 470-71 (citations omitted).

A. The Removal of Steven Young
In the present case, a lengthy procedural history underpins defendant's assignments of error on the issue of attorney Steven Young's dismissal.[6] The crux of *13 this matter centers around a status conference which took place on February 12, 2001. Present were Steven Young, an attorney retained by defendant's family, Nelvil Hollingsworth and Fred Kroenke, attorneys appointed by the trial court, and Premila Burns, the prosecutor. Defendant, although never present in the courtroom, was present in the "lock-up". A scheduling conflict resulted in the conference being rescheduled for a later time that same morning, after Brown had been removed from the "lock-up" and returned to Angola. After a deputy informed the court that corrections officers would not bring Brown back to court, Mr. Young indicated that he did not think defendant's presence in the courtroom was necessary.
Ms. Burns filed a copy of Mr. Young's motion to withdraw from the Clinton cases, which was granted by Judge Ramshur, into this record. She further apprised the court that the State believed that the conflict which had arisen between defendant and his retained counsel in the Clinton cases would prevent Young from further representing Brown in the Baton Rouge murder prosecution. Although Young had initiated his withdrawal from the Clinton cases, he took a passive role at the status conference in Baton Rouge, almost insinuating that removal was being foisted upon him, stating:
I don't understand the term withdrawal. I have no defense to the state's moving that I be terminated from employment in this matter. But I do urge that it is not a voluntary withdrawal on my part. However, I do agree with the state and the court's earlier assessment that the conflict that existed in Clinton would prevail here and possibly taint any prosecution in this matter with my continuing to represent Mr. Brown in these matters here. (Emphasis supplied)
Accordingly, Judge Anderson found that there was an obvious conflict and removed Young as one of Brown's attorneys of record. The State's attorney then noted for the record that defendant had already been transported back to Angola, and Mr. Kroenke agreed that defendant's presence was not required at the hearing just concluded.

B. Young Dismissed at a Status Conference where Defendant was Absent
Brown contends that his retained counsel should not have been dismissed from his employ at a status conference where he was not present. As we discuss in Part I, Section C, the trial court found sufficient evidence of a conflict to justify Young's dismissal. Therefore, we find no error in the trial court's dismissal of Young without defendant's presence, as a criminal defendant does not have a right to be present at status conferences.
La. C. Cr. P. art. 831 provides the rule regarding the presence of a defendant during felony prosecutions and requires that a felony defendant be present: (1) at arraignment; 2) when a plea of guilty, not guilty, or not guilty by reason of insanity is made; 3) at the calling, examination, challenging, impaneling, and swearing of the jury, and at any subsequent proceedings for the discharge of the jury or of a juror; 4) at all times during the trial when the court is determining and ruling on the admissibility of evidence; 5) in trial by jury, at all proceedings when the jury is present, and in trial without a jury, at all times when evidence is being adduced; *14 and 6) at the rendition of the verdict or judgment. However, under La. C. Cr. P. art. 834, a defendant's presence is not required at "the making, hearing of, or ruling on a preliminary motion or application addressed to the court."
Although this Court has ruled that a defendant may "waive" his right to be present in a non-capital case, it has never ruled that a defendant in a capital case may absent himself during the key phases of the trial specified in La. C. Cr. P. art. 831. State v. Lee, 395 So.2d 700 (La.1981). However, neither Articles 831 or 834 provide that a capital defendant is entitled to be present at a pretrial status hearing. Moreover, Young and Kroenke both explicitly waived defendant's presence during the hearing, and therefore failed to preserve the issue for review. See La. C. Cr. P. art. 841; State v. Strickland, 94-0025 (La.11/1/96), 683 So.2d 218.

C. No Conflict of Interest Sufficient to Justify Young's Removal
In a related argument, defendant contends that Young's removal was arbitrary, as there was no showing of a conflict of interest sufficient to justify his removal. We disagree, and find that defendant's allegations of ineffective assistance of counsel in East Feliciana parish were sufficient to require the trial court to mandate Young's removal from defendant's capital trial in East Baton Rouge parish.
In Wheat v. United States, the United States Supreme Court held that a criminal defendant could not waive his right to "conflict free" counsel where his attorney planned to represent both of his co-conspirators and the potential testimony elicited from one of his co-conspirators may have incriminated Wheat. Wheat, 486 U.S. at 155-56, 108 S.Ct. 1692. The Court held that the right to choose one's own counsel is circumscribed where "a court justifiably finds an actual conflict of interest." Id. at 162, 108 S.Ct. 1692. The question of withdrawal of counsel largely rests with the discretion of the trial court, and its ruling will not be disturbed in the absence of a clear showing of abuse of discretion. State v. Cousin, 307 So.2d 326, 328 (La.1975); State v. Boudoin, 257 La. 583, 588-89, 243 So.2d 265, 267 (1971).
Defendant's assignment of error on this matter is without merit, as the trial court was within its great discretion in finding that defendant's allegations of ineffective assistance of counsel in the Clinton proceedings created an impermissible conflict between himself and Mr. Young which prevented Mr. Young from continuing his representation of defendant in the murder prosecutions pending in East Baton Rouge.

II.
In his fifty-seventh assignment of error, defendant asserts that his custodial statements should have been suppressed because he was exposed to tear gas during the forced entry into the residence.[7] We find this assignment of error to be without merit, as the circumstances surrounding his custodial interrogation make clear that Brown was possessed of all necessary faculties to make a free and voluntary waiver of his Miranda rights.
As a general matter, before a confession may be admitted into evidence, *15 the State has the burden of affirmatively showing that it was made freely and voluntarily and not under the influence of fear, duress, intimidation, menace, threats, inducements, or promises. See R.S. 15:451; State v. West, 408 So.2d 1302, 1307 (La.1982); State v. Dewey, 408 So.2d 1255, 1258 (La.1982). Furthermore, if the statement was made during custodial interrogation, the State must show that the defendant was advised of his constitutional rights. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); State v. Petterway, 403 So.2d 1157, 1159 (La.1981); See State v. Sonnier, 379 So.2d 1336, 1355 (La.1979). Once a suspect in custody expresses a desire, at any stage in the process, to interact with the police only through counsel, all questioning must cease and the accused may not be subjected to further interrogation until counsel has been made available to him, unless he initiates further communication, exchanges or conversation with the police, and validly waives his earlier request for counsel. Edwards v. Arizona, 451 U.S. 477, 484-485, 101 S.Ct. 1880, 1885, 68 L.Ed.2d 378 (1981); Miranda, 384 U.S. at 440-445, 86 S.Ct. at 1612. The admissibility of a confession is a question for the trial judge, whose conclusions on the credibility and weight of testimony relating to the voluntariness of a confession for the purpose of admissibility should not be overturned on appeal unless they are not supported by the evidence. State v. Jackson, 381 So.2d 485, 487 (La.1980)
In the instant case, the trial court held a hearing on June 13, 2000 on defendant's motion to suppress his statements. At the hearing, Det. Keith Bates testified that he was present at the Osborne Street address as defendant was being brought out, and that defendant "still had some effects from the gases because I had a little bit myself." When asked specifically about the effects of the gas used to effect the forced entry of the residence from which defendant was arrested, Det. Bates confirmed that by the time Brown arrived downtown some 30 minutes later, he was in "good condition." Defendant was apprehended at approximately 11:55 p.m. His interview with Det. Bates did not commence until nearly 2:00 a.m., by which time no effects of the gas could be detected. Det. Bates indicated that any residual effects that he had personally experienced from his exposure to the gas had passed by the time he began the custodial interview. Det. Bates also testified that he assessed Brown before questioning and believed that the defendant did not appear to be under the influence of any drugs or alcohol, and that he was not physically ill or injured.
Det. Bates stated that defendant gave an oral statement once in custody, and that he asked Det. Harold Williams to witness Brown's interrogation as a "second set of ears." Det. Bates testified he advised defendant of his Miranda rights in the presence of Det. Williams. Det. Bates assessed that defendant appeared mentally alert and able to understand and voluntarily waive his rights. After administering the rights, Det. Bates asked defendant if he was willing to discuss the matter under investigation without an attorney present, to which defendant replied, "Yes, Keith Bates, because I didn't kill any Gays ... I'll be willing to talk to you." No recording device was employed, and Det. Bates took defendant's oral account of the events that transpired in Clinton, on October 4, 1998.
Upon completing the oral interview, Brown took a break to use the restroom and eat, and upon his return, Det. Bates asked if defendant was ready to give a taped statement of the matters that they had just discussed. According to Det. Bates, at this point, Brown demurred, stating, "You know, I think it's in my best *16 interest not to tape and I'd prefer to speak to an attorney." Det. Bates honored defendant's invocation of his right to counsel, and at that point, the interview was terminated. Detective Harold Williams also testified at the motion hearing and confirmed that defendant was not ill from the gas or on any drugs at the time of the interview. Det. Williams observed that defendant freely waived his rights.
At the conclusion of the motion hearing, the trial court denied defendant's motion to suppress his custodial statement. We find that the denial of Brown's motion to suppress was proper, as he has failed to demonstrate that his statement was made while under the influence of fear, duress, intimidation, menace, threats, inducements, or promises. It is clear from the testimony of both officers that any ill effects of the gas used to effect entry in order to apprehend Brown had worn off by the time the custodial interrogation had begun. Further, defendant's claim of having been under the influence is undermined by the invocation of his right to an attorney once Det. Bates suggested recording his statement. We find this assignment of error to be without merit.

III.
In his forty-ninth assignment of error, defendant contends that the trial court improperly admitted photo identification evidence during trial. Specifically, defendant claims that the photographic line-up shown to Ikie Roberts was impermissibly suggestive because he was the only subject in the line-up missing an eye. Defendant filed a motion to suppress the identification evidence, however, the trial court denied the motion at a June 13, 2000 motion hearing. Brown contends that the trial court's denial of his motion to suppress and subsequent admission of evidence regarding Roberts' identification of defendant as his attacker was erroneous. We disagree, and find that the trial court did not err in finding that the State's identification methodology was not suggestive, and that the procedure used by the State did not lead to a substantial likelihood of misidentification.
La. C. Cr. P. Art. 703(D) provides that a defendant has the burden of proof on a motion to suppress an out-of-court identification. To suppress an identification, a defendant must first prove that the identification procedure was suggestive. State v. Prudholm, 446 So.2d 729, 738 (La.1984). An identification procedure is suggestive if, during the procedure, the witness' attention is unduly focused on the defendant. State v. Robinson, 386 So.2d 1374, 1377 (La.1980). However, even where the suggestive nature of the identification process is proven by the defendant or presumed by the court, the defendant must also show that there was a substantial likelihood of misidentification as a result of the identification procedure. State v. Prudholm, 446 So.2d at 739.
The Supreme Court held in Manson v. Brathwaite, 432 U.S. 98, 116, 97 S.Ct. 2243, 2254, 53 L.Ed.2d 140 (1977), that despite the existence of a suggestive pretrial identification, an identification may be permissible if there does not exist a "very substantial likelihood of irreparable misidentification." Under Manson, the factors which courts must examine to determine, from the totality of the circumstances, whether the suggestiveness presents a substantial likelihood of misidentification include: 1) the witness' opportunity to view the criminal at the time of the crime; 2) the witness' degree of attention; 3) the accuracy of his prior description of the criminal; 4) the level of certainty demonstrated at the confrontation; and 5) the time between the crime and the confrontation. Manson, 97 S.Ct. at 2254.
*17 Applying these precepts to the present case, Ikie Roberts, who had been victimized by defendant on October 4, 1998, gave the police a detailed description of his attacker immediately following his ordeal, and reported to police that his assailant was a stocky black male with a tracheotomy scar and a missing eye. On October 5, 1998, Eddie Stewart, Clinton Chief of Police, and Captain Arkell Merritt visited Roberts in the hospital, and showed him a six-person photo line-up containing defendant's picture. Chief Stewart and Captain Merritt testified at the motion hearing and at trial that Roberts selected defendant's photo from the line-up "very quickly" and without hesitation.
Ikie Roberts testified that he has good eyesight and he obtained a good clear look at defendant during the late afternoon attack, as he was within arm's reach of defendant's face for a period of minutes. Roberts testified at trial:
Q. Did you make any notation about any of these three individuals?
A. Yes, Ma'am.
Q. What was that, please?
A. Well, I tried to recognize at the time some of the clothing and the condition, but one of them didn't have on a shirt. That was Mr. Brown. He had a shirt stuck in his back pants pocket, and I noticed that he had several scars and he was missing his right eye.
Q. What type of scars did he have on his body?
A. He had a trac. scar right here in his throat from a tracheotomy, and he has a pretty good size scar across his midsection here.
Q. Okay. And he was missing his right eye entirely?
A. Yes, Ma'am.
Q. Okay. What was his hair like that day?
A. Braids or pigtails or whatever, long, and he had some type of sweat band headband type deal around his head.
Roberts promptly relayed his description of Brown to police after the attack. Roberts recalled that the day after the attack, he made a positive identification of defendant by photo lineup with no hesitation, stating "I know I don't have the wrong man."
Further, when viewing the photographic lineup itself, it is clear that the State sought fill-in subjects with vision problems. One subject's left eye is clouded white and appears to be blind. Another appears to have a lazy eye. While one photograph depicts a man with no apparent ocular difficulties, the two remaining subjects appear to be droopy-eyed as though under the influence of drugs or alcohol. In addition, all of the other subjects have comparable hairstyles, skin tone and facial hair to defendant.
Therefore, we find that the photo line-up was fair, as the State provided fill-in subjects with similar hair, skin tone, and some distinguishing eye feature that would be reasonably comparable to that of the defendant's missing eye.
Further, assuming that a line-up where only one person is missing an eye constitutes a suggestive procedure, this Court must also inquire into whether the suggestiveness of the line-up led to a substantial likelihood of misidentification. In the instant case, defendant fails to demonstrate that Ikie Roberts misidentified him, as the record confirms that Roberts gave a detailed description of his attacker that included distinguishing features in addition to Brown's missing eye, and was unwavering in his positive identification. Based on the totality of the circumstances, no substantial likelihood of misidentification is present and the trial court did not err in *18 denying the defense motion to suppress identification. This assignment of error lacks merit.

IV.
In assignments of error one through seven, defendant contends that the State failed to introduce evidence at trial sufficient to prove his guilt for first degree murder. In defendant's view, the State introduced no direct evidence implicating him as the perpetrator of the crimes, and the State's circumstantial case was bolstered by the "vast amount" of other crimes evidence presented. Defendant argues that the State's case, premised on evidence that he committed criminal acts on Feliciana Drive failed to prove that he was the person who murdered Mr. and Mrs. Gay nor did the State exclude every reasonable hypothesis of innocence.
In order to convict Brown of first degree murder, the State was required to prove: 1) that the defendant possessed the "specific intent to kill or to inflict great bodily harm and [was] engaged in the perpetration or attempted perpetration of ... aggravated arson" pursuant to La.Rev.Stat. 14:30 A(1); or 2) that the defendant possessed the "specific intent to kill or to inflict great bodily harm upon more than one person" pursuant to La.Rev.Stat. 14:30 A(3). Specific criminal intent is defined as "that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." La.Rev.Stat. 14:10(1). Specific intent need not be proven as a fact, but may be inferred from the defendant's actions and the circumstances of the transaction. State v. Maxie, 93-2158, (La.4/10/95), 653 So.2d 526, 532. Deliberately pointing and firing a deadly weapon at close range are circumstances which will support a finding of specific intent to kill. State v. Seals, 684 So.2d 368, 373 (La.1996) (citing State v. Williams, 383 So.2d 369 (La.1980); State v. Procell, 365 So.2d 484 (La.1978)).
When reviewing the sufficiency of the evidence to support a conviction, Louisiana appellate courts are controlled by the standard enunciated in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Under this standard, the appellate court "must determine that the evidence, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime had been proved beyond a reasonable doubt." State v. Neal, 00-0674, (La.6/29/01) 796 So.2d 649, 657 (citing State v. Captville, 448 So.2d 676, 678 (La.1984)).
When circumstantial evidence is used to prove the commission of the offense, La. R.S. 15:438 requires that "assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." Neal, 796 So.2d at 657. Ultimately, all evidence, both direct and circumstantial must be sufficient under Jackson to prove guilt beyond a reasonable doubt to a rational jury. Id. (citing State v. Rosiere, 488 So.2d 965, 968 (La.1986)).
The jury heard evidence in the form of Brown's custodial statement to Det. Keith Bates, taken on December 23, 1998. Defendant admitted that he and his companions were in Clinton on October 4, 1998, for the purpose of robbing a drug dealer known as "Little Man." A thirty-five minute crime-spree ensued, during which time defendant's van was completely disabled in an automobile accident. The State theorized that Brown, now without transportation, kidnapped the Gays and forced them to drive him back to Baton *19 Rouge in their red Ford Escort. The State further hypothesized that once Brown had been transported to Baton Rouge, he shot William and Ann Gay several times and then burned their bodies and their car to destroy the evidence.
After a thorough review of the record, we conclude that the circumstantial evidence presented at defendant's trial was sufficient to prove that he committed first degree murder and excluded any reasonable hypothesis of his innocence. The State's strongest evidence came in the form of tests performed on the telephone cord found binding Ann Gay's hands and near the body of William Gay. The cord gathered from the vehicle was compared to the telephone cord seized from a garbage can at defendant's residence at 4747 Frey Street, as well as a telephone handset from which the cord appeared to have been torn away which was found inside the residence. Various analyses, including fiber, polymer, and metallurgical testing, were conducted by experts from the Louisiana State Police Crime Lab, and three experts from the FBI. Afterwards, the experts agreed that all of the cords in this case were "consistent with originating from a common source." Defendant cross-examined each of the State's forensic experts who tested the cords, and asked them if they could testify to a scientific certainty that all of the cord evidence originated as one continuous piece of cord, however, none would make such a claim.
Despite the inability of the State's experts to testify to a scientific certainty that all of the cords collected in association with this case originated as one continuous piece, the jury was still presented with evidence sufficient to prove defendant was guilty of two counts of first degree murder. The jury heard from several Baton Rouge police officers, who testified that on October 6, 1998, the date they arrived at the Frey Street address to execute the search warrant, they observed defendant's father and a Pop-A-Lock employee trying to gain access to a Chevrolet Camero parked behind the house. Upon executing the warrant and entering the house, officers noted that all of the furniture had been removed and that a thorough cleaning had taken place, with mops and brooms still remaining.
During cross-examination of Det. Bates and during closing argument, defendant asserted that he did not attack Ikie Roberts. While Brown admitted being inside Myrtle Roberts' house, he denied throwing denied kidnapping and killing William and Ann Gay.[8]
*20 Defendant maintains that after he left Myrtle Roberts' house, he took a short cut through a field to Plank Road, where he hitchhiked and paid a white male two thousand dollars to drive him to Baton Rouge. In support of his alibi, defendant stated in closing argument that the State was unable to produce a witness who could testify to seeing him at the Gays' residence, where the victims were alleged to have been kidnapped. Defendant contends that in comparison to the quantity of blood evidence left both inside and outside of Myrtle Roberts' house, none of his blood was ever found inside the Gays' residence. His fingerprints were not recovered on the Gays' patio or inside their home. He further insists that the State failed to meet their burden of proof, as none of the State's witnesses testified to having seen him riding in the car with the Gays during the time period in which he was alleged to have kidnapped them.
However, the jury heard testimony from Ikie Roberts in support of the State's case against Brown. Roberts identified Brown as his attacker the day after the incident and again during trial. Brown attempted to undermine Roberts' testimony by pointing out inconsistencies between Roberts' recollection of his tracheotomy and abdominal scar and the absence of these distinguishing features in police reports. In response to Brown's impeachment attempts, the State introduced testimony from Gina Pineda, the State's expert from Reliagene, which established that the DNA recovered from a bloody fingerprint on the driver's side door of Myrtle Roberts' vehicle belonged to both Brown and Ikie Roberts. Alejandro Varas, one of the State's experts in serology, testified that the commingled blood in the fingerprint suggested that Roberts' blood had been transferred onto defendant's hand during the attack. Further, Carol Richard, an expert in latent fingerprint analysis, testified that the fingerprint left on the door matched defendant's left ring fingerprint. In addition, smears of blood on the door frame, door knob, and three drops of blood inside Myrtle Roberts' house were all found to match defendant's genetic profile. Finally, a smear of blood matching Brown's genetic profile was found on a telephone handset recovered at 4747 Frey Street in Baton Rouge. The State suggested that the cord retrieved from the burning vehicle containing the bodies of William and Ann Gay was ripped from this handset.
Brown's strongest hypothesis of innocence focused on the blood stain found on the doorframe at the Gays' residence. DNA testing revealed that the blood sample did not belong to defendant, Ann Gay, William Gay, Ikie Roberts or Myrtle Roberts. The State attempted to explain the blood stain on the Gays' doorframe as unrelated to their murders. Alejandro Varas, the crime scene technician who lifted the blood sample from the Gays' door frame, testified that it was visually different from the other blood samples he collected in connection with this case, as it was a darker brown, which suggested that it had been there for some time.
Factually, this case bears similarity to State v. Casey, 99-0023 (La.1/26/00), 775 So.2d 1022. Under the facts present in Casey, the jury found that the victim had *21 been raped and strangled to death by the defendant. A six foot long wad of tape with large amounts of hair attached to it was found hidden in a dresser drawer. Casey, 775 So.2d 1022, 1027. Investigators determined that the hair on the tape matched that of the victim, and the twisting pattern in the tape matched the bruise marks on the girl's neck. Id. Two thumb prints were found on the tape which investigators subsequently matched to the right and left thumb prints of the defendant. Id. In addition, seminal fluid lacking sperm was discovered on the body of the victim. Id. As there was no sperm, DNA analysis conclusively linking the defendant was impossible. Id. Casey alleged that the circumstantial evidence presented by the State was insufficient to support his conviction. Id. at 1034. This Court affirmed the defendant's conviction and sentence of death based on the fact that his fingerprints were found on the murder weapon and the fact that he had undergone a vasectomy, which would have resulted in his producing seminal fluid without sperm. Id. at 1034-35.
In the instant matter, the jury was presented extensive circumstantial evidence of defendant's guilt. Although the blood stain present at the Gay's residence did not match Brown's genetic profile, the jury was able to accept the State's explanation and discount the blood on the Gays' doorframe as unrelated to their murders. Further, the jury made a credibility determination and rejected defendant's alibi as false. Moreover, all of the other evidence presented supports and corroborates the State's theory that Brown kidnapped and killed the Gays because he needed transportation back to Baton Rouge following the Clinton crime spree. The jury was within the bounds of rationality to accept the testimony of Ikie Roberts, the fingerprint on Myrtle Roberts' truck, the presence of Brown's blood in Myrtle Roberts' home, and the telephone cord which appeared to have originated from the same source; and reject as unconvincing defendant's representation that he had left Feliciana Drive. Defendant was identified as present at two adjacent houses on that street, just before the occupants of the third adjacent house were kidnapped and killed. We find this assignment of error to be without merit.

V.
In assignments of error fifteen through twenty, defendant asserts that his right to self-representation under Faretta v. California was violated by the State, the trial court, and by appointed counsel. Faretta v. California, 422 U.S. 806, 835, 95 S.Ct. 2525, 2541, 45 L.Ed.2d 562 (1975). Essentially, defendant contends that once he asserted his right to self-representation, this right was undermined by the trial court acquiescence to a "hybrid representation" that interfered with the defendant's control over the presentation of his defense. Defendant points to incidents where his appointed counsel questioned witnesses, his appointed counsel's recommendation that the State object to his line of questioning during a bench conference, appointed counsel's pursuit of a divergent theory of his defense, and his exclusion from bench conferences as violations of his Faretta rights. We find that the actions of the trial court in allowing defendant to participate in a form of "hybrid" representation did not violate his Faretta right, and further, that the trial court ensured that defendant's invocation of his right to self-representation was sufficiently "knowingly and intelligently made" to satisfy the requirements of Faretta. Therefore, we find that these assignments of error lack merit.

A. Defendant Asserted his Faretta Right and Requested "Hybrid" Representation
Both the Louisiana and federal constitutions guarantee a criminal defendant's *22 right to the assistance of counsel. Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963); State v. Brooks, 452 So.2d 149, 155 (La.1984). Nevertheless, a defendant may elect to represent himself if the choice is "knowingly and intelligently made" and the assertion of the right is "clear and unequivocal." U.S. Const. Sixth Amend.; La. Const. art. I, § 13; Faretta v. California, 422 U.S. 806, 835, 95 S.Ct. 2525, 2541, 45 L.Ed.2d 562 (1975); State v. Hegwood, 345 So.2d 1179, 1181-82 (La.1977).
In Faretta, the United States Supreme Court recognized that a trial court may not force a lawyer upon a defendant when the defendant insists he wants to conduct his own defense and voluntarily and intelligently elects to proceed without counsel. However, he must ask clearly and unequivocally to proceed pro se and he must also make his request in a timely manner. Faretta, 422 U.S. at 835, 95 S.Ct. at 2541. Further, a defendant must be made aware of the dangers and disadvantages of self-representation so that the record demonstrates that "`he knows what he is doing and his choice is made with his eyes open.'" Id, 422 U.S. at 835, 95 S.Ct. at 2541 (quoting Adams v. United States ex rel. McCann, 317 U.S. 269, 279, 63 S.Ct. 236, 242, 87 L.Ed. 268 (1942)). Faretta made clear that the accused's "technical legal knowledge, as such, [is] not relevant to an assessment of his knowing exercise of the right to defend himself." Id., 422 U.S. at 836, 95 S.Ct. at 2541. In State v. Santos, this Court held that where a trial judge is confronted with an accused's unequivocal request to represent himself, the judge need determine only whether the accused is competent to waive counsel and is "voluntarily exercising his informed free will." State v. Santos, 99-1897, p. 3 (La.9/15/00), 770 So.2d 319, 321 (quoting Faretta, 422 U.S. at 835, 95 S.Ct. at 2541).
In McKaskle v. Wiggins, 465 U.S. 168, 104 S.Ct. 944, 79 L.Ed.2d 122 (1984), the United States Supreme Court confirmed the right of a criminal defendant to represent him or herself pro se while allowing the trial court to appoint standby counsel "to explain and enforce basic rules of courtroom protocol." McKaskle v. Wiggins, 465 U.S. at 184, 104 S.Ct. at 954. The Court further found that stand-by counsel may participate in the trial as long as his or her participation does not "seriously undermine the defendant's appearance before the jury in the status of one representing himself." Id., 465 U.S. at 187, 104 S.Ct. at 956.
In State v. Bodley, 394 So.2d 584, 593 (La.1981), this Court confronted a similar situation and reasoned that "while an indigent defendant has a right to counsel as well as the opposite right to represent himself, he has no constitutional right to be both represented and representative." Bodley, 394 So.2d at 593. In Bodley, the defendant sought to both have counsel appointed and to participate actively in his own defense at trial. The Bodley Court held that a criminal defendant did not have the right to act as both "represented and representative" due to the potential for the disruption of the trial process. Id. at 593. The Bodley court recognized that
"While it may be within the discretion of a District Court to permit both a criminal defendant and his attorney to conduct different phases of the defense in a criminal trial (citations omitted), for purposes of determining whether there has been a deprivation of constitutional rights a criminal defendant cannot logically waive or assert both rights. The defendant must make a choice, and he should not be permitted to manipulate his choice so that he can claim reversible *23 error on appeal no matter which alternative he chose in the district court."
Id. at 593 (citations omitted).
In the instant matter, defendant clearly and equivocally invoked his right to self-representation under Faretta. Defendant's trial commenced on April 22, 2002. On May 2, 2002, during the State's direct examination of Ikie Roberts, the jury was removed and Brown's attorneys advised the court and the State that the defendant wanted to cross-examine Ikie Roberts, against his counsel's advice. Defendant presented the following rationale:
Your honor, there are several things in this case that me and Mr. Hollingsworth have been discussing for quite a time now, but it seems as if he done got in this courtroom and has abandoned my defense. Whereas, all of the inconsistencies of these witnesses that the state is parading up here he have it right here in black and white. I'm steady sending him papers down here of the inconsistencies of these witnesses. Here he is saying he don't want to do this, you know, and I have a right to present a defense. He is abandoning my defense.
The court interpreted defendant's request as asking him to act as "co-counsel." Defendant affirmed that acting as co-counsel was his desire, stating, "I have a few questions of my own of some witnesses that I would like to ask, that he is choosing not to ask for some reason or another." The court then explained that in choosing to participate in his own defense, defendant would be subject to the rules of evidence and rules of procedure just like an attorney. The court thoroughly questioned defendant on his competence in the following colloquy[9]:
The Court: If you don't know how to properly ask the question, then the question is not going to get asked.
Defendant: Right.
The Court: Do you have any legal training?
* * *
Defendant: Yes, I have been in legal training for the last two years or something.
The Court: You're talking about research in prison.
* * *
Defendant: Yeah.
The Court: What type of formal education do you have? How far did you go in school?
Defendant: The eighth grade was the last grade I finished.
The Court: Obviously, you can read and write.
Defendant: Yes, sir, better than most that graduate.
* * *
The Court: Well, you understand this is pretty high stakes, right?
* * *
Defendant: Yeah, it's my life. That's why I'm not fixing to sit here and let Mr. Hollingsworth play with my life by steadily letting the state parade witnesses up here with lies....
The Court: All right. You understand that this is a death penalty case. Your life is on the line. You understand we have two highly qualified attorneys that have been appointed to *24 represent you? Do you understand that?
Defendant: I understand.
The Court: You also understand that not just any attorney can be appointed to represent you. Even some attorneys aren't qualified to handle a death penalty case.
Defendant: I understand that too, your honor.
The Court: But you think you're qualified?
Defendant: Yeah. I'm qualified for my case. I might not be qualified for other defendants' cases, but my case I'm qualified for. I have been on my case more than any attorney could ever spend time on.
The Court: All right. The court will allow you to act as co-counsel and cross-examine this witness....
In the instant matter, it is clear that defendant's request was for a "hybrid" representation, a scenario Wiggins envisioned and declined to recognize as an entitlement:

Faretta does not require a trial judge to permit "hybrid" representation of the type Wiggins was actually allowed. But if a defendant is given the opportunity and elects to have counsel appear before the court or jury, his complaints concerning counsel's subsequent unsolicited participation lose much of their force. A defendant does not have a right to choreograph special appearances by counsel. Once a pro se defendant invites or agrees to any substantial participation by counsel, subsequent appearances by counsel must be presumed to be with the defendant's acquiescence, at least until the defendant expressly and unambiguously renews his request that standby counsel be silenced. [Emphasis supplied].
Wiggins, 465 U.S. at 183, 104 S.Ct. at 953.
After defendant invoked his right to self-representation, the assistant district attorney stated on the record that in honoring defendant's Faretta rights, the State would not object to further cross-examination of witnesses, so as to allow the defendant to ask questions. The court concurred with this procedure, which was followed throughout the remainder of trial. Defendant solely conducted the cross-examination of Ikie Roberts, Det. Keith Bates, and Sgt. Dennis Moran's final appearance on the stand. In addition, he participated in the cross-examination of Pat Lane, the State's firearms and fingerprint expert, Dr. Michael Smith, an FBI expert in metallurgy, and Gina Pineda, the State's DNA expert from Reliagene. Many other witnesses were cross-examined by counsel, or were dismissed without defense questioning, so defendant's role was as a partial participant, or co-counsel. Indeed, defendant and counsel each gave a closing argument following the guilt phase of trial. Nevertheless, defendant remained the beneficiary of his legal team throughout the trial.
Thus, this Court finds defendant's assignment of error on this issue without merit. Brown requested and received hybrid representation, and did not demand that his trial counsel be dismissed until the trial neared conclusion.

B. Defense Counsel Suggested the State object to Brown's Line of Questions
In a related argument, defendant takes issue with a bench conference that occurred during his cross-examination of Ikie Roberts in which stand-by counsel suggested that the prosecutor object to defendant's chosen course of introducing a *25 transcript of a 911 tape as part of his cross-examination. Prior to the bench conference, defendant had sought to elicit from Roberts any statements or descriptions of his assailant that Roberts may have given to the police immediately following the attack. When Roberts denied making any statements to the police before he was transported to the hospital, defendant sought to introduce the 911 transcript to impeach him. Apparently perceiving defendant's failure to understand the rules of evidence, the judge called the attorneys up for a bench conference:
The Court: Here we are, not that it's unexpected, but I have told him he has to go by the same rules as everybody else.... The reason I called y'all up here though is you're sitting at the table with him. Y'all are still his attorneys. You have to assist him as you can. I would assume that means also helping him ask the right questions.
* * *
Ms. Burns: He is trying to impeach this man with something 
The Court: The 911 tape. That's not this man.
Ms. Burns: That's the wife. He didn't call 911. So I would object to that.
Mr. Hollingsworth: I knew that was coming.
Mr. Kroenke: That's what I mean. I don't see this 
Ms. Burns: You want me to make the objection?
Mr. Kroenke: Yeah. I think that's all we can do is object, sustain, object. If he asks us something I will tell him yes or no, you can or can't, whatever. I don't want to keep pulling on him.
The Court: So, Ms. Burns, you're going to object?
Ms. Burns: I'm going to object because he can't be impeached with someone else's statement.
The court sustained the State's objection, and defendant moved on to another line of questioning.
While defendant cites this bench conference from which he was excluded as evidence of a conspiracy against him between appointed counsel, the State, and the court; the fact remains that he was informed by the trial judge that he would be held to the same rules as an attorney, should he invoke his rights under Faretta. Counsel's agreement that the State interpose an objection in the above-cited passage was not an effort to undermine or interfere with defendant's decision to participate in his defense, but rather, an effort by all to conduct the proceedings in an orderly fashion by observing the Rules of Evidence. Moreover, the bench conference at issue took place outside the hearing of the jurors, so defendant's appearance before the jury was not diminished. Thus, the trial court did not err in allowing defendant's attorney to suggest that the State object to his attempt to impeach a witness with a third party statement. This assignment of error is without merit.

C. Counsel and Defendant Pursued Divergent Theories of his Defense
In further support of his contention that his Faretta rights were violated, defendant claims that the divergent defense theories between himself and his court appointed attorneys undermined his right to self-representation. Specifically, defendant wished to present an alibi defense, while his appointed counsel had envisioned a defense of resting on defendant's presumption of innocence. Since Brown did not invoke his right to self-representation until mid-way through the State's case, no witnesses had been sub-poenaed *26 on defendant's behalf.[10] We find this assignment of error similarly without merit.
This Court has previously held that an accused who elects to participate in a hybrid representation does not have the right to dictate his trial strategy. Bodley, 394 So.2d at 593. Further, we have consistently held that a defendant's right to counsel of his choice cannot be manipulated to obstruct the orderly procedure of the courts and cannot be used to interfere with the fair administration of justice. State v. Bridgewater, 00-1529, pp. 20-21 (La.1/15/02), 823 So.2d 877, 896. As this Court held in State v. Seiss, a "defendant must exercise his right to counsel of his choice at a reasonable time, in a reasonable manner and at an appropriate stage of the proceedings." State v. Seiss, 428 So.2d 444, 447 (La.1983)
In the instant matter, the defendant invoked his right to self-representation after the trial was already in progress. Further, he elected for a "hybrid" representation which allowed his trial counsel to continue to represent him using a divergent theory of the case. It is clear that the defendant is essentially attempting to manipulate the trial process to produce reversible error. Defendant had the option of either being bound by the trial tactics of counsel, or of representing himself. Under the circumstances, defendant fails to demonstrate a Sixth Amendment violation.

D. Defendant was Excluded from Bench Conferences
Finally, defendant contends that his exclusion from numerous bench conferences undermined his appearance of control to the jury. Specifically, defendant cites a bench conference during his cross-examination of Ikie Roberts in which stand-by counsel called for a bench conference after defendant sought to impeach the witness with the bill of particulars from the prosecution against defendant in Clinton, stating:
Your honor, while we are up here, I feel it is incumbent upon the lawyers at this point to ask the court has this defendant not proven to this court that he is incompetent legally and cannot represent himself? Has he not proven that at this point?
The judge disagreed, ruling that defendant may proceed as he "still has that right under Faretta."
Although defendant argues that his exclusion from bench conferences undermined his actual control, in truth, his request for hybrid representation, or to act as his own co-counsel, rightfully left his stand-by attorneys in a proper position to attend conferences at the bench. Defendant never sought total control of his defense under Faretta, and thus, counsel's presence at the bench was sufficient. Again, the bench conferences took place out of the hearing of the jury, and the record does not contain any evidence that the actions of the trial court or appointed counsel undermined defendant's appearance of control over his defense. Thus, these assignments of error lack merit and warrant no relief by this Court.

VI.
In assignments of error forty-three through forty-seven, defendant claims that *27 a lack of funding at pretrial hearings undermined his rights to due process and equal protection. Brown claims that the funding "crisis" in East Baton Rouge Parish during the period in which he was convicted and sentenced to death resulted in his defense team being unable to successfully investigate and argue motions on his behalf and to sufficiently rebut the State's experts at trial. In these assignments of error, defendant refers to both the funding necessary for defense experts as well as for reimbursement of investigation and counsel compensation expenses.

A. Funds for Auxiliary Services were not Provided "Soon Enough"
At the outset of the proceedings, defendant filed a motion for indigent status and to qualify for State-funded auxiliary services, which the trial court granted. Thereafter, defendant filed a "Motion for Reimbursement of Fees, Costs, Expenses" and "Defendant's Motion for Ex Parte Hearing under Ake v. Oklahoma," which articulated the necessary defense experts needed and the anticipated costs of retaining their services. However, before any of these motions could be heard, on February 1, 2000, the defense sought a stay, in a pleading entitled "Motion to Stay All Proceedings and to Ensure Adequate Resources for a Complete Defense."[11]
The trial court held a hearing on the funding issue on March 16, 2000.[12] At the conclusion of the March 16, 2000 hearing, the judge denied the defense motion for reimbursement of fees, costs, and expenses. Thereafter, following a hearing on March 30, 2000, in which the State stipulated to experts needed by the defense, the judge entered an order dated May 2, 2000, authorizing the defense the following experts and expert funds:

 1. A private investigator $5,000.00
 2. A psychologist $3,000.00
 3. A sociologist  mitigation expert $3,000.00
 4. A DNA expert $2,000.00
 5. A fiber optics specialist $2,000.00

A subsequent hearing was held on the funding issue on June 13, 2000. Prior to the hearing, the defense filed its "Second Motion to Stay All Proceedings and to Ensure Adequate Resources for a Competent Defense." The district court promptly denied the motion and the defense sought writs.[13]
However, as the funding issue relates to defendant's assignments of error, Brown does not claim that he was denied funding, but rather that funding was not made available "soon enough" during the pretrial stages, and thus, the trial court should have stayed the proceedings until funding was available. However, defendant fails to *28 demonstrate prejudice in these respects. Thus, defendant's assignment of error regarding the timeliness of funding is without merit.

B. Mental health experts were necessary to rebut the State's claim that defendant's statements to police were willing, voluntary, and intelligent.
Defendant contends that he suffered from "brain damage" and "borderline intelligence" that undermined the "willing, voluntary, and intelligent" nature of his custodial statements to Det. Keith Bates. We have already addressed the voluntary nature of defendant's custodial statements in Section II, and have held that Brown's exposure to tear gas did not impair his ability to comprehend and waive his Miranda rights. Further, in Section VIII, we will address defendant's allegations that he suffers from brain damage or borderline intellect as it relates to assignment of error sixty-three. However, it is clear that defendant's allegations of a funding crisis as it relates to his inability to obtain mental health experts is without merit. Defendant's oral motion for funding for a neurological examination was not made until May 9, 2001, whereas the hearing on his motion to suppress his custodial statement was held nearly a year earlier, on June 13, 2000.
We find this assignment of error without merit.

C. State's Witnesses were not Investigated Thoroughly.
In a related argument, defendant asserts that at the June 13, 2000 motion hearing, the State presented the testimony of seven witnesses, resulting in the trial court's denial of his motions to suppress his custodial statement, evidence and witness identification. Defendant contends that the outcome of the motion hearing would have been different had he been afforded the services of a private investigator. We find this assignment of error to be without merit.
The State's obligation to provide effective assistance of counsel to an indigent defendant is satisfied by its furnishing of the indigent's defense counsel with the "basic tools of an adequate defense," at no cost to the defendant. Britt v. North Carolina, 404 U.S. 226, 227, 92 S.Ct. 431, 433, 30 L.Ed.2d 400 (1971). This Court has noted that "the right to a private investigator may in many cases be an adjunct to the right to counsel." State v. Madison, 345 So.2d 485, 490 (La.1977).
As an initial matter, defendant's complaint in this matter is moot, as the judge entered an order dated May 2, 2000, authorizing the defense $5,000 to hire a private investigator, a full five weeks prior to the hearing on the motion to suppress on June 13, 2000.
Further, regardless of the date the defense employed the services of an investigator, the likelihood that an investigator would have had any measurable difference in the outcome of that hearing is extremely doubtful. As was previously discussed, the motion to suppress defendant's statement was properly denied as defendant made a knowing and voluntary waiver of his rights, and Det. Bates testified that the statement was not coerced.
As for defendant's motion to suppress the evidence[14], all of the evidence accumulated in this case was obtained via search warrants. Thus, since the issuing magistrate had already made a probable cause determination that based on the affiants' knowledge and reasonably trustworthy *29 information, the warrants were issued on the reasonable belief that an offense had been committed and there was a "fair probability" that evidence of the crime would be found in a particular place. State v. Byrd, 568 So.2d 554, 559 (La.1990); La. C. Cr. P. art. 162. The task for a reviewing court is simply to insure that under the totality of the circumstances, the magistrate had a "substantial basis" for concluding that probable cause existed. Illinois v. Gates, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). Defendant's claims that the services of a private investigator could have changed the trial judge's determination that the search warrants were validly issued are dubious at best.
Finally, this Court has addressed Ikie Roberts' identification of defendant in Section III, and held that the trial court did not err in denying defendant's motion to suppress. Given defendant's unique physical characteristics, Ikie Roberts' identification of Brown as his attacker was well-founded. A private investigator's ability to undermine Mr. Roberts' positive identification is doubtful. No relief is due to the defendant with regard to this assignment of error.

D. Counsel Reimbursement and Compensation Necessary to Ensure an Adequate Defense.
Defendant contends that his trial counsel is entitled to be compensated for defending an indigent client. He argues that for eight months, from the time they were appointed to the case leading up to the June 13, 2000 motion hearing, his appointed attorneys had not been compensated for their time.
In State v. Wigley, 624 So.2d 425, 429 (La.1993), this Court held that "any assignment of counsel [from the private] bar to defend an indigent defendant must provide for reimbursement to the assigned attorney of properly incurred and reasonable out-of-pocket expenses and overhead costs". The Wigley Court discussed "out-of-pocket expenses," but left the term undefined. Wigley, 624 So.2d at 428. In context, however, these expenses may include "funds required for investigation, experts, and scientific tests...." Id. In funding such costs, the Court opined that the money could "come from the Indigent Defender Board, from the state, from one court fund or another, from the local government subdivision pursuant to La.Rev.Stat. Ann. § 15:304, or from any other available source." Id. at 429.
Here, defendant's brief, the State's opposition brief, and the record as a whole are all silent as to exactly how much and from what sources Mr. Hollingsworth and Mr. Kroenke were ultimately compensated for defending Gregory Brown in his capital murder trial. On the scant showing made, defendant fails to demonstrate that the funding issue raised pretrial remained unaddressed. Without more, defendant has not shown that a Wigley violation occurred in this case, or that his attorneys "bankrupted" themselves in his defense. Therefore, this assignment of error is without merit.

E. A Stay was the Only Appropriate Remedy where Defense Counsel was Unable to Investigate or Consult with Necessary Experts.
In his final argument, defendant contends that his defense was diminished by the lack of funding, and therefore, the June 13, 2000 motion hearing should have been stayed.
As previously noted, the trial court ordered expert funding totaling $15,000 on May 2, 2000, and additional funds not to exceed $10,000 on May 15, 2000, both in advance of the June 13, 2000 hearing date. *30 Consequently, defendant's claims that the hearing should have been delayed are without merit. In addition, as we have previously noted, the record is silent as to when, how much, and from what source defendant's lawyers were ultimately paid. This Court will not extend Wigley to require the delay of a trial on the merits in order to resolve the collateral issue of compensation for defense counsel. Defendant has failed to show prejudice to his defense as a result of the "funding crisis" present in East Baton Rouge Parish. These assignments of error are without merit.

VIII.
Defendant contends in his sixty-third assignment of error that the execution of a man with a serious brain injury is impermissible under the Eighth Amendment's prohibition against cruel and unusual punishment. Defendant relies upon the United States Supreme Court's recent decision in Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002) and this Court's decision in State v. Williams, 01-1650 (La.11/1/02), 831 So.2d 835 We find this assignment of error to be without merit, however, as defendant failed to present testimony during either the guilt or penalty phases of his trial sufficient to establish that he suffers from mental retardation.
In Atkins v. Virginia, the Supreme Court held that the execution of a mentally retarded person constitutes excessive punishment and violates the Eighth Amendment. This Court addressed the diagnosis of mental retardation in State v. Williams, and held that without a legislative mandate, the definition available in LSA-R.S. 28:381 appropriately described mental retardation as:
(1) subaverage intelligence, as measured by objective standardized IQ tests; (2) significant impairment in several areas of adaptive skills; and (3) manifestations of this neuro-psychological disorder in the developmental stage, i.e., by the age of 22 years.
Williams, 831 So.2d 835, 854.
Further, the Williams court held that the defendant alleging mental retardation must prove by a preponderance of the evidence that he meets the criteria established in LSA-R.S. 28:381 during a pre-trial evidentiary hearing before a judge, rather than a jury, where the court has `reasonable grounds' to believe a defendant is mentally retarded. Williams, 831 So.2d at 859-60; See La. C. Cr. P. art. 643
In response to both Atkins and Williams, the legislature recently enacted 2003 La. Acts 698, which created La. C. Cr. P. art. 905.5.1.[15] Article 905.5.1(C) *31 provides for the procedure to be followed in the event that a defendant raises a claim of mental retardation. Under Article 905.5.1(C), a defendant has the burden of proving mental retardation by a preponderance of the evidence. Article 905.5.1(H)(1) defines mental retardation as:
a disability characterized by significant limitations in both intellectual functioning and adaptive behavior as expressed in conceptual, social, and practical adaptive skills. The onset must occur before the age of eighteen years.
The Article concludes with an advisory list of several medical conditions which "do[] not necessarily constitute mental retardation." See La. C. Cr. P. art. 905.5.1(H)(2). Included on the list are emotional stress in home or school, learning disabilities, mental illness, personality disorders, and traumatic brain damage occurring after age 18.
*32 In the present case, defendant fails to show mental retardation under both the definition provided in Williams and La. C. Cr. P. art. 905.5.1. The evidence established that defendant was shot in the eye on February 1, 1996, at the age of 22, while committing an armed robbery. Dr. Mark L. Zimmerman, a forensic psychologist, examined defendant and assessed his intelligence in the borderline range, although Dr. Zimmerman's testimony failed to quantify his assessment into an IQ range. A bullet fragment remained in defendant's brain, and in addition to the loss of his right eye, brain tissue in the right frontal lobe and temporal area was damaged, which Dr. Zimmerman contends affects the defendant's ability to control impulses and interpret nonverbal stimuli. In addition, Dr. Sarah Deland testified as an in expert forensic psychiatry, and determined that the frontal and temporal lobes are the areas of the brain responsible for controlling behavior. According to Dr. Deland, after defendant was shot, those areas of the brain ceased to function properly, thereby depriving Brown of the ability to make reasonable choices.
Notwithstanding the fact that the defendant's experts failed to allege that he suffered from mental retardation, his claim is undermined by his display of an intact survival mentality, which Brown exhibited when he destroyed all trace evidence of his crime by burning his victims in their car. Further, he orchestrated the removal of the furniture and sanitizing of his house at 4747 Frey Street. In addition, Brown successfully eluded police apprehension for 82 days.
Furthermore, although defendant's formal education ended when he left the eighth grade to serve time in the Louisiana Department of Corrections as a juvenile, Brown has no history of requiring special education classes. In addition, defendant undermined any perception of mental retardation when he served as his own trial counsel and cross-examined witnesses during the guilt phase of his trial. Defendant cross-examined Ikie Roberts and was able to expose omissions in Roberts' description of his attacker. Defendant also forced Roberts to admit that he was unaware of whether the person wielding the hammer at him was left or right-handed. At the conclusion of Mr. Roberts' cross-examination, the trial court determined that defendant was competent to go forward with his self-representation efforts under Faretta.
Later, Brown cross-examined the State's forensic experts who examined the telephone and cord fragments. His line of questioning forced Pat Lane and Dr. Michael Smith to concede that they could not state to a scientific certainty that the cord fragments originated as one continuous piece of cord. Defendant cross-examined the State's DNA expert to enforce the point that a blood sample found on a door-frame of the Gays' home excluded him as the donor. Finally, Brown cross-examined Detective Keith Bates with respect to the officer's interrogation of him subsequent to his arrest. During the State's guilt phase closing argument, defendant interrupted with objections. Thereafter, Brown gave a skillful closing argument.
Brown is not mentally retarded, and neither Atkins nor Williams provides support for defendant's assertion of mental retardation. We find no Eighth Amendment violation in subjecting this defendant to the death penalty. Thus, this assignment of error is without merit.

CAPITAL SENTENCE REVIEW
Under La. C. Cr. P. art. 905.9 and La. S.Ct. R. 28, this Court reviews every sentence of death imposed by Louisiana courts to determine if it is constitutionally excessive. In making this determination, *33 the Court considers whether the jury imposed the sentence under the influence of passion, prejudice or other arbitrary factors; whether the evidence supports the jury's findings with respect to a statutory aggravating circumstance; and whether the sentence is disproportionate, considering both the offense and the offender.
The district judge has filed the Uniform Capital Sentence Report ("UCSR") required by La.S.Ct.R. 28 § 3(a) and the Department of Public Safety and Correction submitted a Capital Sentence Investigation Report ("CSIR"). See La.S.Ct.R. 28 § 3(b). In addition, the state filed a Sentence Review Memorandum.
Those documents indicate that the defendant, Gregory Carl Brown, is an African-American male, born on May 15, 1973 to the marital union of Gregory Carl Williams and Delores Brown Williams. At the penalty phase, defendant's aunt, Glenda Colbert, testified that she helped raise defendant because his mother was only 14 or 15 when he was born. Colbert further explained that both of defendant's parents were "actively involved in drugs, drinking." Defendant stayed with Colbert during periods of his mother's various incarcerations. Colbert described the family situation as constantly violent whenever defendant and his siblings were with their parents. Colbert added that defendant stayed with her and was an upstanding child until the age of 11, at which time, he went to live with his mother's parents.
Defendant was educated in East Baton Rouge Parish, where he attended a variety of schools before leaving in the eighth grade to serve time in the Louisiana Department of Corrections as a juvenile. Defendant has no history of requiring special education classes or assistance for "slow learners." Defendant's criminal record began when he was a juvenile. On May 11, 1985, he was charged with misdemeanor theft by shoplifting, for which he was later counseled and warned. On December 29, 1986, defendant was charged with six counts of simple burglary. He pled guilty to one count on August 3, 1987, and was sentenced to three years in the Louisiana Department of Corrections (DOC). On April 10, 1987, defendant was charged with purse-snatching. He pled guilty on August 3, 1987, and was sentenced to serve two years in DOC. On June 3, 1989, defendant was charged with driving without a license, hit and run driving, reckless operation, fleeing, felony theft, and resisting an officer. He pled guilty to the reckless operation charge and was sentenced to 90 days in DOC. On August 14, 1989, defendant was charged with attempted second degree murder and two counts of felony theft. He pled guilty to felony theft and was sentenced to two years in DOC. On September 21, 1990, defendant was charged with escape and aggravated assault, and was prosecuted as an adult for these charges. He pled guilty and was sentenced to three years in DOC.
According to the CSIR, defendant has had very little legitimate employment history. He worked for a few months at KSM Crawfish Plant in 1989. He also reported "hit and miss" employment at his grandfather's janitorial business as a youth. Defendant's primary means of employment has been in the illegal drug business.
As an adult, defendant's rap sheet, which is included in the CSIR documents, lists numerous pages of arrests on various dates, but which do not readily state the disposition. At the penalty phase, the State introduced evidence of defendant's adult convictions including three cases in the Baton Rouge drug court, all of which concluded with defendant's November 9, 1999 guilty pleas to two counts of possession of marijuana with intent to distribute *34 and one count of illegal carrying of weapons. Defendant received concurrent sentences of eight, nine and ten years imprisonment at hard labor.
In addition, an East Feliciana Parish jury found defendant found guilty of attempted murder and armed robbery on April 14, 2000, relative to the Clinton crimes in which Ikie Roberts was the victim. The court sentenced him to two consecutive terms of 50 years imprisonment at hard labor.
During previous incarcerations, defendant was evaluated on January 4, 1988 under the WISC-R short form and that test estimated an IQ of 83, which is considered the average range of intellectual functioning. Another test for intellectual function was conducted on August 28, 1989, at which time defendant reflected a BETA IQ of 82.
Defendant has one son, Kendall Moore, who was born in 1990 during defendant's relationship with Zeta Williams. On May 7, 1998, defendant married Sabra Banks. On September 9, 1998 (less than one month before the instant offenses) a daughter, Precyous Unique Brown, was born to this union.
Defendant did not testify at either the guilt phase or the penalty phase of his capital trial. However, he did act as his own co-counsel, and used the opportunity to convey his alibi theory whenever possible. The defense presented four witnesses at the penalty phase: defendant's aunt, two mental health professionals, and defendant's step-grandfather. On September 12, 2002, the court imposed the sentence of death by lethal injection, as to each of the two counts, as unanimously recommended by the jury.

PASSION, PREJUDICE, AND OTHER ARBITRARY FACTORS
The first degree murders of Ann and William Gay occurred on October 4, 1998, and defendant's trial commenced on April 22, 2002, some three and one-half years after the crimes were committed. While a few prospective jurors indicated that they recalled hearing about the events at the time they occurred, none had been unduly influenced by newspaper, television, or radio reports. No motion to change venue was ever filed by the defense, and the voir dire responses confirmed that no such motion was necessary.
Defendant is an African-American male, who was 25 years old at the time of his offenses. The two murder victims were both Caucasian, a married couple, Ann and William Gay, who, at the time they were killed, were ages 60 and 62 years old, respectively.
The defense urged that the State exercised its peremptory challenges discriminatorily to exclude minorities, especially African-Americans from the jury, in violation of Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). As addressed in the unpublished Appendix to this opinion, assignment of error 42, even though the trial court never found a prima facie case of discrimination, the State articulated race neutral reasons on the record for all of the disputed challenges. Further, the twelve-member jury was comprised of ten whites and two blacks. No prejudice is apparent.
Defendant raised the claim that the State's presentation of gruesome photographs of the victims inflamed the passions of jury and caused him prejudice. However, as is discussed in the unpublished Appendix to this opinion, Assignment of Error 50, no error is apparent in the trial court's decision to admit a limited number of crime scene photographs depicting the burned remains of the victims. No prejudice is apparent in that ruling.
*35 There is no indication in the record that the jury's determination was based on passion, prejudice, or any other arbitrary factor.

AGGRAVATING CIRCUMSTANCES
The State relied on two aggravating circumstances under La.C.Cr.P. art. 905.4(A) and the jury returned the verdict of death on both counts, agreeing that both were supported by the evidence: (1) the offender was engaged in the perpetration or attempted perpetration of a second degree kidnapping, an aggravated arson, and an armed robbery; and (4) the offender knowingly created a risk of death or great bodily harm to more than one person; La.C.Cr.P. art. 905.4(A)(1) and (4); see Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); see also R., Vol. 3, pp. 638-39 (penalty phase verdict forms). As discussed previously in Section V, assignments of error 1-7, and in the unpublished opinion, assignment of error 62, the aggravating circumstances relied upon by the State were fully supported by the evidence. Consequently, defendant's sentences of death are firmly grounded on the finding of these two aggravating circumstances.

PROPORTIONALITY REVIEW
Although the federal Constitution does not require proportionality review, Pulley v. Harris, 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984), comparative proportionality review remains a relevant consideration in determining the issue of excessiveness in Louisiana. State v. Burrell, 561 So.2d 692, 710 (La.1990). This Court, however, has set aside only one death penalty as disproportionately excessive under the post-1976 statutes, finding in that one case, inter alia, a sufficiently "large number of persuasive mitigating factors." State v. Sonnier, 380 So.2d 1, 9 (La.1979).
This Court reviews death sentences to determine whether the sentence is disproportionate to the penalty imposed in other cases, considering both the offense and the offender. If the jury's recommendation of death is inconsistent with sentences imposed in similar cases in the same jurisdiction, an inference of arbitrariness arises. Sonnier, supra.
The state's Sentence Review Memorandum reveals that since 1976, jurors in the Nineteenth Judicial District Court, which comprises East Baton Rouge Parish, have recommended imposition of the death penalty on approximately 25 occasions, including the current case. Several of the salient features of the instant case make it similar enough to other death sentences recommended by juries in the 19th JDC to conclude that defendant's sentence is not disproportionate. See, e.g., State v. Bowie, 00-3344 (La.4/3/02), 813 So.2d 377; State v. Broaden, 99-2124 (La.2/21/01), 780 So.2d 349; State v. Wessinger, 98-1234 (La.5/28/99), 736 So.2d 162, cert. denied, Wessinger v. Louisiana, 528 U.S. 1050, 120 S.Ct. 589, 145 L.Ed.2d 489 (1999); Williams v. Louisiana, 525 U.S. 838, 119 S.Ct. 99, 142 L.Ed.2d 79 (1998). Compared to these cases, it cannot be said that the death sentence in this case is disproportionate. None of the documents filed pursuant to La. S.Ct. R. 28 warrant reversal of defendant's death sentence.

DECREE
For the reasons assigned, the defendant's convictions and death sentence are affirmed. In the event this judgment becomes final on direct review when either: (1) the defendant fails to petition timely the United States Supreme Court for certiorari; or (2) that court denies his petition for certiorari; and either (a) the *36 defendant, having filed for and been denied certiorari, fails to petition the United States Supreme Court timely, under its prevailing rules, for rehearing of denial of certiorari; or (b) that court denies his petition for rehearing, the trial judge shall, upon receiving notice from this Court under La.C.Cr.P. art. 923 of finality of direct appeal, and before signing the warrant of execution as provided by La. R.S. 15:567(B), immediately notify the Louisiana Indigent Defense Assistance Board and provide the Board with reasonable time in which: (1) to enroll counsel to represent the defendant in any state post-conviction proceedings, if appropriate, pursuant to its authority under La. R.S. 15:149.1; and (2) to litigate expeditiously the claims raised in that original application, if filed in the state courts.
AFFIRMED.

ON APPLICATION FOR REHEARING
REHEARING GRANTED IN PART; DENIED IN PART.
We grant rehearing in part for the limited purpose of clarifying our statement regarding State v. Wigley, 624 So.2d 425 (La.1993). In the original opinion in this case, we commented that we would not extend Wigley to require delay of a trial on the merits in order to resolve the collateral issue of compensation for defense counsel. State v. Brown, 03-0897, p. 42 (La.4/12/05). That statement, viewed in isolation, appears to conflict with our holding just eleven days earlier in State v. Citizen, 04-1841 (La.4/1/05), 898 So.2d 325. In Citizen, reviewing an interlocutory ruling made prior to trial, we held that, upon motion of the defendant prior to trial, the judge may prohibit the State from going forward with the prosecution until he or she determines that appropriate funding to cover counsel's anticipated expenses and overhead is likely to be available. What we should have made more clear in our original opinion in the instant case is that our holding in Citizen had no direct relevance to our resolution of the defendant's claims that a lack of funding denied him his due process and equal protection rights.
In the instant case, as summarized in the original opinion at pages 27-29, the defendant in advance of trial filed various motions seeking reimbursement for defense costs and a stay of all proceedings. The trial court held a hearing on the funding issue and denied the defendant's motions. But prior to trial, the trial court did authorize funds to the defense totaling $15,000.00 for expert witness and investigation fees. Unlike in Citizen, however, the defendant here did not seek supervisory writs from the trial court's pre-trial rulings, was allocated funds, and proceeded to trial. As more fully set forth in our original opinion, the defendant, now post-trial, has failed to establish any prejudice to his defense as a result of an alleged lack of funding then available to reimburse his counsel for expenses and overhead.
In all other respects, the defendant's rehearing application is denied.
JOHNSON, J., would deny the rehearing.
Although this Court should have cited State v. Citizen, 04-1841 (La.4/1/05), 898 So.2d 325, which was released eleven days earlier, rather than State v. Wigley, 624 So.2d 425 (La.1993) to resolve the issue of compensation for defense counsel, the result remains unchanged. Defendant, Brown, was provided the basic tools for an adequate defense. With regard to expert fees, Brown did not claim that he was denied funding, but rather that funding was not made available "soon enough" during the pretrial stages, and therefore, the *37 trial court should have stayed the proceedings until funding was made available. However, the record indicated that the trial court authorized the defense $15,000 to secure expert services, and thus, defendant failed to demonstrate prejudice in these respects. Therefore, under the facts present in Brown, a stay of the proceedings was not necessary, as funds were made available.
Further, as to compensation of defense counsel, the record as a whole was silent as to exactly how much and from what sources defendant's attorneys were ultimately compensated. Thus, on the scant showing made, defense counsel failed to demonstrate that the funding issue raised pretrial remained unaddressed. Thus, even if Citizen had been applied, Brown's attorneys would have nevertheless been unable to stay the proceedings for lack of funding.
NOTES
[1] La. Const. Art. V. § 5(D) provides that a case is appealable to the Louisiana Supreme Court if a defendant has been convicted of a capital offense and a penalty of death has been imposed.
[2] Official dispatch records indicate that the telephone calls alerting authorities to Davy Thompson's shooting and Sarah Chaney's accident both came in at 5:23 p.m. Lt. Billy Demoss testified at trial that the scene of the accident was approximately one-half mile from Thompson's trailer, and further, that when he left Thompson's house to respond to the accident, it took him "less than a minute" while traveling "a little faster than the speed limit, but I wasn't going extremely fast."
[3] Brown had previously been indicted by Bill of Information on November 23, 1998 in East Feliciana Parish for violations of La. R.S. 14:27, 14:30, and 14:64 for the October 4, 1998 armed robbery and attempted second degree murder of Ikie Roberts. Trial commenced on April 13, 2000 and concluded on April 14, 2000, with Brown being found guilty on both counts. On June 27, 2000, defendant was sentenced to fifty years at hard labor, without benefit of probation, parole, or suspension of sentence. Defendant's sentences for these crimes are to run consecutively.
[4] Brown alleges in assignment of error forty-eight that the trial court improperly denied his request for a speedy trial. We address the merits of this assignment of error more fully in the unpublished appendix to this opinion, however, we note that the State brought the defendant to trial on April 22, 2002, well within the statutory prescriptive period outlined in La.C.Cr. P. art. 578(1).
[5] In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the state and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the assistance of counsel for his defense.
[6] The minute entry from the initial court date of May 25, 1999, indicates that defendant informed the court that he would be represented by Steven Young, an attorney who had previously represented Defendant in an earlier criminal proceeding. On June 2, 1999, when Mr. Young did not appear for the La. C. Cr. P art 701 speedy trial hearing, the prosecutor informed the court that her investigator had spoken with Mr. Young and learned that defendant's relatives had attempted to retain him, but that so far "only $400 was forthcoming, and he said obviously that is not sufficient." Thereafter, on August 12, 1999, defendant advised the court that he could not afford to retain counsel and the court appointed the Office of the Public Defender to represent him. On September 21, 1999, the court relieved the public defender's office and appointed trial counsel, Nelvil Hollingsworth, to represent defendant. Fred Kroenke enrolled as co-counsel for the penalty phase of the trial on October 13, 1999, and on that same date, Steven Young filed a motion to enroll as counsel, after having been retained by defendant's relatives. The minute entry from that date also indicates that Mr. Young enrolled as co-counsel. On May 2, 2000, the court held a motion hearing where Mr. Young's continued absence from the Baton Rouge proceedings was noted.

Ultimately, the court recognized that Mr. Young had been retained by defendant's relatives, but that he was only serving as defense counsel with regard to the Clinton proceedings for defendant's crimes against Ikie Roberts and his mother, Myrtle. On May 31, 2000, Steven Young attended the status hearing set by the court. When asked about his commitment to the instant case, Mr. Young indicated that he would honor his contract of employment with defendant's relatives, which only applied to the Clinton trials. Mr. Young further indicated that it was his "understanding that there was a possibility of a supplementation of my earnings at the public trough." The judge reminded Mr. Young that when he was permitted by the court to enroll as counsel, the court specifically asked how he was being paid in this case, because defendant already had two court appointed attorneys, "[s]o there's isn't any public trough here that you're going to be paid out of to my knowledge." Defendant confirmed to the court that it was his desire that Mr. Young continue to represent him. At the conclusion of the May 31, 2000 hearing, Mr. Young was still on the case, but not as appointed counsel, and with a full comprehension that he would not receive public remuneration.
According to the court minutes, Steven Young attended the next two court dates. However, on August 31, 2000, Mr. Young filed an ex parte motion to withdraw as counsel in defendant's Clinton cases. In that motion, Mr. Young indicated that he had represented defendant up to and through his motion for reconsideration, but that a conflict of interest arose when defendant insisted that the motion to reconsider include specific instances in which Young rendered ineffective assistance of counsel. Judge Ramshur, of East Feliciana Parish, signed the motion to withdraw, and Young subsequently filed a similar motion with the First Circuit Court of Appeal.
[7] Defendant alleges several errors resulting from the trial court's refusal at a June 13, 1999 motion hearing to suppress his custodial statement, Ikie Roberts' identification, and evidence gathered in connection with investigation. This Court addresses defendant's fifty-fifth assignment of error alleging the trial court's failure to suppress the evidence in the unpublished appendix to this opinion.
[8] Mr. Brown: Ladies and gentlemen of the jury, it's a pleasure to have you all on the jury. And I pray that you all have kept your promise to me and the court and kept and open mind throughout these proceedings.

* * *
I realize that the State has put on quite a show trying to close your minds to the actual facts of the crime in which I'm charged by parading witness after witness and exhibit after exhibit in front of you all. But the actual fact to the matter is the State and all those witnesses and exhibits have yet to prove that I was ever at the Gays' residence or in their yard, where the State alleges the Gays' was kidnapped from. You have heard no witness nor evidence that shows the Gays being at home around the time the other incidents took place.
* * *
Ladies and gentlemen, you have not even heard no one even allege they thought that they seen me with the Gays or in their car. But you all do have before you blood that was found at the Gays' residence on their door frame. And the DNA expert told you all that there's no way possible that the blood is for me or anyone else who the State has taken blood from.
* * *
The judge will instruct you that in order for you to convict me the State must have excluded every reasonable hypothesis of innocence. The hypothesis of innocence is there because you have heard no evidence ... that I did not go behind Myrtle Roberts' house to the woods and to Plank Road. There's no evidence the State has put on to say that's false. You've heard no evidence that says that I did not catch a ride, I did not catch that ride that Detective Keith Bates said I told him I caught.
* * *
I'll leave you with that hypothesis of innocence. Thanks for your time and your open mind you have kept throughout this proceeding.
[9] In assignment of error twenty-one, defendant urges that the trial court failed to address critical issues concerning his competency to represent himself. We address the merits of this assignment of error in the unpublished appendix to this opinion.
[10] Defendant cites the impossibility of contacting witnesses on less than 24-hour's notice when he was only permitted 15 minutes of phone use per day at the parish prison as evidence of counsel hindering his efforts to present an alibi defense. While counsel offered to produce Jonathan Booth and Brian Williams, both of whom were incarcerated at parish prison at the time, any other witnesses were the responsibility of defendant, a feat that Brown considers insurmountable given his incarceration.
[11] This motion was brought by attorney Anthony M. Bertucci, on behalf of trial counsel, Hollingsworth and Kroenke.
[12] At the hearing, the District Attorney for the parish of East Baton Rouge pointed out the inconsistency in the pleading which was captioned "State v. Gregory Brown," but signed as "Anthony Bertucci on behalf of Attorneys Fred Kroenke and Nelvil Hollingsworth." Midway through the hearing, Mr. Bertucci filed a motion to withdraw the earlier motion to stay proceedings and ensure adequate resources, after an adverse decision was reached by the First Circuit Court of Appeals in an identical motion he filed in State v. Jeff, 99-1876 (La.App. 1 Cir. 12/28/99), 761 So.2d 574. After receiving the motion to withdraw, the court held that Mr. Bertucci was voluntarily removed from the case and not a proper spokesman for the defendant.
[13] Mr. Bertucci attempted to notarize his own signature on the pleading, and the First Circuit did not consider the writ application. See State v. Brown, 00-1439 (La.App. 1st Cir.3/8/01). Id. at 510. Thereafter, the writ application was abandoned, as there is no indication of a ruling on the merits from the court of appeal.
[14] The merits of this assignment of error are addressed in the unpublished Appendix.
[15] Art. 905.5.1. Mental retardation

A. Notwithstanding any other provisions of law to the contrary, no person who is mentally retarded shall be subjected to a sentence of death.
B. Any capital defendant who claims to be mentally retarded shall file written notice thereof within the time period for filing of pretrial motions as provided by > Code of Criminal Procedure Article 521.
C. (1) Any defendant in a capital case making a claim of mental retardation shall prove the allegation by a preponderance of the evidence. The jury shall try the issue of mental retardation of a capital defendant during the capital sentencing hearing unless the state and the defendant agree that the issue is to be tried by the judge. If the state and the defendant agree, the issue of mental retardation of a capital defendant may be tried prior to trial by the judge alone.
(2) Any pretrial determination by the judge that a defendant is not mentally retarded shall not preclude the defendant from raising the issue at the penalty phase, nor shall it preclude any instruction to the jury pursuant to this Section.
D. Once the issue of mental retardation is raised by the defendant, and upon written motion of the district attorney, the defendant shall provide the state, within time limits set by the court, any and all medical, correctional, educational, and military records, raw data, tests, test scores, notes, behavioral observations, reports, evaluations, and any other information of any kind reviewed by any defense expert in forming the basis of his opinion that the defendant is mentally retarded.
E. By filing a notice relative to a claim of mental retardation under this Article, the defendant waives all claims of confidentiality and privilege to, and is deemed to have consented to the release of, any and all medical, correctional, educational, and military records, raw data, tests, test scores, notes, behavioral observations, reports, evaluations, expert opinions, and any other such information of any kind or other records relevant or necessary to an examination or determination under this Article.
F. When a defendant makes a claim of mental retardation under this Article, the state shall have the right to an independent psychological and psychiatric examination of the defendant. A psychologist conducting such examination must be licensed by the Louisiana State Board of Examiners of Psychologists. If the state exercises this right, and upon written motion of the defendant, the state shall provide the defendant, within time limits set by the court, any and all medical, correctional, educational, and military records, and all raw data, tests, test scores, notes, behavioral observations, reports, evaluations, and any other information of any kind reviewed by any state expert in forming the basis of his opinion that the defendant is not mentally retarded. If the state fails to comply with any such order, the court may impose sanctions as provided by Article 729.5.
G. If the defendant making a claim of mental retardation fails to comply with any order issued pursuant to Paragraph D of this Article, or refuses to submit to or fully cooperate in any examination by experts for the state pursuant to either Paragraph D or F of this Article, upon motion by the district attorney, the court shall neither conduct a pretrial hearing concerning the issue of mental retardation nor instruct the jury of the prohibition of executing mentally retarded defendants.
H. (1) "Mental retardation" means a disability characterized by significant limitations in both intellectual functioning and adaptive behavior as expressed in conceptual, social, and practical adaptive skills. The onset must occur before the age of eighteen years.
(2) A diagnosis of one or more of the following conditions does not necessarily constitute mental retardation:
(a) Autism.
(b) Behavioral disorders.
(c) Cerebral palsy and other motor deficits.
(d) Difficulty in adjusting to school.
(e) Emotional disturbance.
(f) Emotional stress in home or school.
(g) Environmental, cultural, or economic disadvantage.
(h) Epilepsy and other seizure disorders.
(i) Lack of educational opportunities.
(j) Learning disabilities.
(k) Mental illness.
(l) Neurological disorders.
(m) Organic brain damage occurring after age eighteen.
(n) Other handicapping conditions.
(o) Personality disorders.
(p) Sensory impairments.
(q) Speech and language disorders.
(r) A temporary crisis situation.
(s) Traumatic brain damage occurring after age eighteen.