STATE OF LOUISIANA IN          *          NO. 2019-CA-0917
THE INTEREST OF C.R.
                               *
                                          COURT OF APPEAL
                               *
                                          FOURTH CIRCUIT
                               *
                                          STATE OF LOUISIANA

                        * * * * * * *


                          APPEAL FROM
              JUVENILE COURT ORLEANS PARISH
              NO. 2019-073-09-DQ-C, SECTION "C"
             Honorable Candice Bates Anderson, Judge
                        * * * * * *
                  **Judge Daniel L. Dysart**
                        * * * * * *
(Court composed of Judge Roland L. Belsome, Judge Daniel L. Dysart, Judge Joy
Cossich Lobrano)

LOBRANO, J., CONCURS IN THE RESULT

Leon Cannizzaro
DISTRICT ATTORNEY
Donna Andrieu
CHIEF OF APPEALS
Scott G. Vincent
ASSISTANT DISTRICT ATTORNEY
PARISH OF ORLEANS
619 S. White Street
New Orleans, LA 70119
       COUNSEL FOR APPELLEE/STATE OF LOUISIANA


Katherine M. Franks
LOUISIANA APPELLATE PROJECT
P. O. Box 220
Madisonville, LA 70447
       COUNSEL FOR APPELLANT




                          **AFFIRMED**

                      **JANUARY 29, 2020**

C.R., appearing with counsel, was adjudicated delinquent on September 17, 2019, for violation of La. R.S. 14:39, negligent injuring. After the defense waived all delays, the trial court imposed a sentence of six months in the custody of the Office of Juvenile Justice, suspended, and placed C.R. on active probation for a term of two years, with special conditions. C.R. appeals, arguing that there was insufficient evidence to adjudicate him delinquent, and that the trial court erred in considering his post-arrest silence as a factor in determining the disposition. For the reasons that follow, we affirm.

**BACKGROUND:**

The State filed a petition on March 14, 2019, charging C.R. with one count of negligent injuring, for shooting his cousin.

On November 24, 2018, C.R. and his twin were spending time with their cousin, T.B.[1], at T.B.'s house, on the west bank of New Orleans over the Thanksgiving holidays.[2] C.R.'s mother and T.B's mother are sisters. On the

---

[1] All of the boys were thirteen years old at the time of this incident.
[2] C.R. did not testify, nor did the victim, T.B., as to the events of the evening of November 24, 2018. These facts are gleaned from the police reports and the testimony of the witnesses at trial.

1

evening of the incident, T.B. was upstairs with C.R. in the game room. C.R.'s twin was in another upstairs room playing video games. T.B. went downstairs to ask his father, T.B., Sr., if he could take him and his cousins hunting the next day. As his father had just gotten home from working offshore, T.B. was told the next weekend would be better. T.B. returned upstairs.

Shortly thereafter, T.B.'s parents heard a loud noise upstairs, and suspected the boys were shooting fireworks inside. Both parents rushed to the stairway, asking what's going on as they climbed the stairs. C.R. came out of the game room and told them that T.B. had shot himself. T.B.'s mother specifically remembered C.R. saying that T.B. had shot himself underneath the neck.

T.B.'s mother immediately went back down the stairs and called 911 on the house phone. T.B's father entered the room and saw his son lying on the floor, slumped against the wall, bleeding profusely from a head wound. He testified that he thought his son was dead.

After calling 911, T.B.'s mother, a registered critical care nurse, returned to the room and began to administer aid to her son, attempting to control the bleeding and preventing her son from aspirating his blood. She asked T.B's father to call 911 again.

New Orleans Police Officer Cory Lauer testified that he was dispatched on a call of a "34S," which is an aggravated battery by shooting. When he arrived on the scene, he was directed upstairs by persons in the house. He explained that although EMS personnel had arrived before him, because there was a shooting,

2

EMS could not enter the house until a police officer determined it was safe and announced a "Code 4." Officer Lauer testified that when he entered the upstairs room, a woman, who he later learned was T.B.'s mother, was administering aid and attempting to hold the wound to T.B.'s head closed and to help him breathe. He testified that he observed two rifles leaning against the wall in a corner of the room, and a shotgun on the floor next to T.B. He also observed a hole in the wall above T.B., with blood all around it and on the carpet. He estimated that the hole in the wall was approximately five feet above the floor.

Detective John Bakula of the New Orleans Police Department arrived on the scene after EMS left with T.B. and his mother. The initial call he received was that there was a shooting; however, en route the call was changed to a possible accidental discharge of a weapon. Upon entering the upstairs room, Det. Bakula observed two rifles in the right front corner of the room and a shotgun in the back left corner. Near the two rifles was a hole in the wall approximately five feet from the floor. He observed a large amount of blood and what he believed was brain matter on the wall. Someone on the scene told him that C.R. was in the room with T.B. at the time of the shooting.

Det. Bakula spoke with C.R. about the incident and was told that T.B. had brought the guns into the room, and that the two boys were passing the guns back and forth and holding them. T.B. went downstairs to ask his father about hunting the next day, but was told no. T.B. was going to put the guns away when he dropped one and it fired, striking T.B.

3

After discussions with Officer Lauer about what they had each observed, it was agreed that C.R.'s account of the events did not add up.  Officer Lauer told Det. Bakula he found the gun next to T.B. on the floor, but that the gun had been moved by EMS personnel.  Det. Bakula testified that after he conferred with his supervisor, Sgt. Claude Nixon, they agreed that T.B. had not been injured as C.R. reported.  It was decided that C.R. would be arrested for the shooting.  Upon questioning by the trial judge, Det. Bakula explained that guns shoot in a straight line; therefore, if T.B. had dropped the gun as C.R. stated, there would not be a hole in the wall five feet above where T.B. was found.

Sgt. Nixon was sent to the crime scene by his superintendent.  He too arrived after T.B. had been transported to the hospital.  He testified that he was aware that gunshot residue was found on C.R., and none was found on T.B.  Further, he learned that T.B. sustained a small entry wound to the back of his head and an exit wound near his chin.  Looking at the hole in the wall, he opined that the hole in the wall and the blood spatter around it would indicate that the bullet traveled parallel to the floor, not at an upward angle.  He listened to the various accounts of what had happened and what he and other police personnel observed, and agreed with Det. Bakula that C.R. was responsible for the shooting.

T.B.'s mother and father both testified that T.B. was familiar with guns, having hunted with his father since he was nine years old.  They both testified that the family's guns were kept locked, with the long guns being kept in a gun case in

4

the master bedroom closet downstairs.  T.B.'s father admitted that T.B. knew how to unlock the case.

**ERROR PATENT REVIEW:**

We have reviewed the record for errors patent, and find none.

**DISCUSSION:**

C.R. argues that the evidence presented by the State was insufficient to sustain the verdict.  He argues that the State did not establish that any criminal negligence by him caused T.B.'s injuries, nor did the State prove beyond a reasonable doubt that he was the person who handled the weapon.

He also argues that the trial judge erred in considering C.R.'s post-arrest silence as a factor in determining the disposition, and in ordering C.R. to apologize to his family prior to the adjudication in violation of his Fifth Amendment right to remain silent.

**Sufficiency of the Evidence:**

When reviewing the sufficiency of the evidence in juvenile cases, the standard of review is whether, viewing all of the evidence in a light most favorable to the prosecution, the juvenile court committed manifest error in finding beyond a reasonable doubt that the juvenile committed a delinquent act.  *See State v. C.N.,* 11-0074, pp. 4-5 (La.App. 4 Cir. 6/29/11), 69 So.3d 711, 714 (discussing in detail the constitutional, statutory, and jurisprudential basis for this standard of review).

This standard, first enunciated in *Jackson v. Virginia*,[3] has been held to be the clear standard of review for Louisiana appellate courts by the Louisiana Supreme Court. *State v. Brown* 03-0897, p. 18 (La. 4/12/05), 907 So.2d 1, 22. It specifically requires that the appellate court determine that the evidence was sufficient to convince a rational trier of fact "that all of the elements of the crime had been proved beyond a reasonable doubt." *State v. Neal*, 00-0674, p. 9 (La. 6/29/01), 796 So.2d 649, 657, (citing *State v. Captville,* 448 So.2d 676, 678 (La. 2/27/84)). This appellate standard is applicable to juvenile cases. *State in the Interest of T.E.,* 00-1810, pp. 4-5 (La.App. 4 Cir. 4/11/01), 787 So.2d 414, 417.

Additionally, our state Constitution requires that the appellate court review both facts and law in juvenile adjudication appeals. La. Const. Art. V, §10 B.

> Except as otherwise provided by the constitution, [an appellate court's] jurisdiction in civil cases extends to both law and facts; in criminal matters, it criminal jurisdiction extends only to questions of law. La. Const. 1974, art. V, §5C. Juvenile delinquency proceedings do not fall within the category of criminal prosecutions, as is evident from long established jurisprudence …, and the special juvenile provision [of the La. Constitution]. Accordingly, since the constitution does not provide otherwise, the scope of review of this court in juvenile delinquency proceedings extends to both the law and the facts. (citations omitted.)

*State in the Interest of Batiste,* 367 So.2d 784 (La. 1979). When analyzing circumstantial evidence, La. R.S. 15:438 provides, "assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence."

When a case involves circumstantial evidence, the court does not determine whether another possible hypothesis exists which could explain the events in an

---

[3] 443 U.S. 307, 318-19, 99 S.Ct. 2781, 2788-89 (1979).

exculpatory fashion. Rather, the reviewing court evaluates the evidence in the light most favorable to the prosecution and determines whether the alternative hypothesis is sufficiently reasonable that a rational juror could not have found proof of guilt beyond a reasonable doubt. *See Captville,* 448 So.2d at 678. If rational triers of fact could disagree as to the interpretation of the evidence, the rational trier's view of all of the evidence most favorable to the prosecution must be adopted. Thus, irrational decisions to convict will be overturned, rational decisions to convict will be upheld, and the actual fact finder's discretion will be impinged upon only to the extent necessary to guarantee the fundamental protection of due process. *State v. Mussall,* 523 So.2d 1305, 13010 (La. 1988).

Louisiana Revised Statute 14:39 defines negligent injuring, in pertinent part, as:

> (1) The inflicting of any injury upon the person of another by criminal negligence.

Louisiana Revised Statute 14:12 states:

> Criminal negligence exists when, although neither specific nor general criminal intent is present, there is such disregard of the interest of others that the offender's conduct amounts to a gross deviation below the standard of care expected to be maintained by a reasonably careful man under the circumstances.

The record contains no direct evidence as to the cause of the shooting; however, the circumstantial evidence presented at trial supports the trial court's factual finding that C.R. negligently shot T.B. T.B. was shot in the back of his head suggesting that it was unlikely his injuries were caused by him dropping the gun as he carried it. Additionally, the blood spatter and the hole in the wall approximately five feet above the floor further suggests that the bullet's trajectory was horizontal, not upward. C.R.'s argument that there was no medical testimony

7

to support that the gunshot entered the back of T.B.'s head, or a crime scene reconstruction performed to determine the trajectory of the bullet, is of no merit. Det. Bakula testified the hole in the wall was approximately five feet above T.B.'s head, there was blood and brain matter on the wall, and T.B. had been shot in the back of his head. Sgt. Nixon, after conferring with Det. Bakula also examined the scene. Based on his years of experience, he agreed that the accident could not have taken place as C.R. described. The fact that no crime scene reconstruction was conducted or that no medical testimony was introduced does not negate the testimony of two experienced law enforcement officers. Further, we disagree with C.R.'s argument that it was not proven that he handled the guns brought into the room by T.B. Det. Bakula, who spoke with C.R. at the scene, testified that C.R. told him he and T.B. had exchanged the guns as they were discussing the possibility of hunting the next day.

The evidence adduced at trial established that the two boys were upstairs in a room together, there were three guns in the room, one of the guns was fired, and T.B. was struck in the back of his head. These are all facts established by the testimony of experienced police officers that, when combined with the circumstantial evidence presented, is sufficient for a rational trier of fact to conclude beyond a reasonable doubt that C.R. was guilty of every essential element of the crime.

C.R. also argues that both T.B. and his parents were negligent and should bear some blame for the incident. However, a victim's own negligence does not negate a finding of criminal negligence on the part of the defendant. *State v. Desoto,* 07-1804, p. 10 (La. 3/17/09), 6 So.3d 141, 148.

**_Violation of Right to Remain Silent during Sentencing:_**

C.R. argues that the trial court violated his Fifth Amendment right to remain silent by considering the fact that he had not confessed or apologized to T.B. or his family for the shooting. The trial court also stated that it found C.R. to have shown no remorse during the course of the trial, despite the evidence that prior to the incident he and his cousin enjoyed a very close, loving relationship.

C.R. did not make or file a motion to reconsider sentence. La. C.Cr.P. art. 881.1 E provides:

> Failure to make or file a motion to reconsider sentence or to include a specific ground upon which a motion to reconsider sentence may be based, including a claim of excessiveness, shall preclude the state or the defendant from raising an objection to the sentence or from urging any ground not raised in the motion on appeal or review.

As no motion was made or filed, C.R. is precluded from raising this issue on appeal.

Accordingly, for the reasons set forth above, C.R.'s adjudication and disposition are affirmed.

**AFFIRMED**