NOT DESIGNATED FOR PUBLICATION

| | | |
|---|---|---|
| **STATE OF LOUISIANA** | * | **NO. 2025-KA-0232** |
| **VERSUS** | * | |
| | | **COURT OF APPEAL** |
| **JOSE E. MORENO** | * | **FOURTH CIRCUIT** |
| | * | |
| | | **STATE OF LOUISIANA** |

* * * * * * *

APPEAL FROM
25TH JDC, PARISH OF PLAQUEMINES
NO. 22-0553, DIVISION "B"
Honorable Michael D. Clement
* * * * * *
**Judge Paula A. Brown**
* * * * * *

(Court composed of Judge Daniel L. Dysart, Judge Sandra Cabrina Jenkins, Judge
Paula A. Brown)

**JENKINS, J., CONCURS IN RESULT**

Christopher A. Aberle
LOUISIANA APPELLATE PROJECT
P.O. Box 8583
Mandeville, LA 70470-8583

 Jose E. Moreno #795214
David Wade Correctional Center
670 Bell Hill Road – H2B
Homer, LA 71040

      COUNSEL FOR DEFENDANT/APPELLANT

Charles Ballay
DISTRICT ATTORNEY

Jason Napoli
ASSISTANT DISTRICT ATTORNEY
333 F. Edward Hebert Blvd. Bldg. 201
Belle Chasse, LA 70037

      COUNSEL FOR PLAINTIFF/APPELLEE

                    **AFFIRMED**
             **FEBRUARY 12, 2026**

PAB
DLD
SCJ

This is a criminal appeal. Defendant, Jose E. Moreno ("Defendant"), appeals his conviction and sentence of aggravated rape in violation of La. R.S. 14:42.[1] For the reasons more fully outlined below, we affirm Defendant's conviction.

**FACTS AND PROCEDURAL HISTORY**

On February 23, 2022, a grand jury indicted Defendant for the 2004 aggravated rape of the victim ("J.T."),[2] who was three years and four months old at the time of the offense. Defendant entered a plea of not guilty on April 25, 2022. Before trial commenced, the State moved, pursuant to La. C.E. art 412.2,[3] to

---

[1] Louisiana Revised Statutes 14:42 will be discussed more fully, *infra*.

[2] The initials of the juveniles involved in this matter will be used instead of their names to ensure their confidentiality. *See* La. Ch.C. art. 412; Uniform Rules of Louisiana Courts of Appeal, Rule 5-2.

[3] Louisiana Code of Evidence article 412.2 provides:

> A. When an accused is charged with a crime involving sexually assaultive behavior, or with acts that constitute a sex offense involving a victim who was under the age of seventeen at the time of the offense, evidence of the accused's commission of another crime, wrong, or act involving sexually assaultive behavior or acts which indicate a lustful disposition toward children may be admissible and may be considered for its bearing on any matter to which it is relevant subject to the balancing test provided in Article 403.

> B. In a case in which the state intends to offer evidence under the provisions of this Article, the prosecution shall, upon request of the accused, provide reasonable

1

introduce evidence that Defendant committed a sexual battery against another juvenile, A.C., in Pike County, Mississippi and a second rape of J.T., which also occurred in Pike County. The district court granted the State's motions to introduce said evidence. This matter came for a three-day jury trial on October 15, 2024. The State presented eight witnesses. The Defendant did not present any witnesses of his own. The pertinent testimony elicited at trial is summarized below.

*Mary Cosse*

Mary Cosse ("Ms. Cosse")—J.T.'s grandmother and Defendant's ex-wife—has two daughters, Amy Tiser ("Mrs. Tiser") and Joaunna Coon ("Mrs. Coon"). Mrs. Tiser has two children, one being J.T. Mrs. Coon has three children, one being A.C. Ms. Cosse began a relationship with Defendant in 2004. She and Defendant lived together in Port Sulphur, Louisiana, at the Delta Hotel in the same room. Ms. Cosse said that J.T. would frequently visit her and Defendant when they lived at the Delta Hotel, and there were many times when J.T. was left alone with Defendant. Ms. Cosse testified that there was a common room with a piano in the Delta Hotel where Defendant was alone with J.T., which was close to her apartment. She explained that after Hurricane Katrina struck, she and Defendant evacuated to McComb, Mississippi, where they lived together.

Ms. Cosse testified that J.T. and A.C. frequently visited her residence in McComb and that there were numerous times that Defendant was left alone with each of the children. She explained that in July 2006, her daughter Mrs. Coon

notice in advance of trial of the nature of any such evidence it intends to introduce at trial for such purposes.

C. This Article shall not be construed to limit the admission or consideration of evidence under any other rule.

called her and told her that Defendant had molested A.C. Ms. Cosse said that she immediately confronted Defendant and kicked him out of her house. She later learned that Defendant also molested J.T. Ms. Cosse stated that before she was notified, she was unaware of the sexual abuse and never had any concern that her grandchildren were in danger with Defendant. Ms. Cosse spoke with Defendant within twenty-four hours after kicking him out, and he told her that he was on his way to Mexico. Pike County Sheriff's Office was notified about the abuse, and Defendant eventually turned himself into the Sheriff's office. Ms. Cosse identified Defendant in court as the man she began a relationship with in 2004.

*Joaunna Coon*

Mrs. Coon—A.C.'s mother and J.T.'s aunt—testified that she was living in Pike County, Mississippi, in 2005 and 2006, which was about 15 minutes from McComb. Her mother, Ms. Cosse, lived with Defendant about twenty minutes from her residence. Mrs. Coon explained that she would drop A.C. off to Ms. Cosse's residence a couple times throughout the week while she worked. In July of 2006, Mrs. Coon was watching both A.C. and J.T., along with other children. Mrs. Coon testified that while she was watching the children, her other daughter came into the room and told her that A.C. was on top of J.T. moving up and down. This behavior alarmed her, so she asked A.C. where she learned it from. A.C. said that Defendant did that to her.

After Mrs. Coon finished speaking with A.C., she called her husband and sister, notified the Sheriff's office and brought A.C. to the hospital. She said that Investigator Davis Haygood ("Inv. Haygood") was assigned to her case and came to the hospital to interview A.C. Defendant was later arrested and charged for molesting A.C. Defendant pled guilty and served ten years in prison. Mrs. Coon

testified that Defendant did not plead guilty nor was he punished for any crime in regards to J.T. at that time. Mrs. Coon identified Defendant in the courtroom as the man Ms. Cosse was living with in McComb, Mississippi.

*Investigator Davis Haygood*

On July 2, 2006, Inv. Haygood was the chief investigator for Pike County Sheriff's Office in Mississippi. He said that he received a report from his patrol officer that stated that Mrs. Coon believed Defendant had sexually assaulted A.C. At that time, A.C. was four years old. Inv. Haygood attested that he was concerned because victims of sexual abuse at such a young age are usually unable to clearly articulate what happened to them. Nonetheless, Inv. Haygood set up an interview for A.C. at the Children's Advocacy Center ("CAC"). He explained that when a child suffered any type of abuse, the Sheriff's office protocol was to set up an interview with the CAC because CAC interviewers are trained to deal with victims that are children. Inv. Haygood testified that during the interview A.C. was unable to disclose specifics of the offense, which was common among victims her age. He said that based on the interview alone, A.C. did not disclose enough information for the Sheriff's office to make an arrest at that time.

Three days later, Mrs. Tiser, J.T.'s mother, went to the Sheriff's office and filed a report stating that Defendant molested J.T. Inv. Haygood said that he followed the same protocol that he had with A.C. and set up an interview for J.T. at the CAC. The interview took place on July 6, 2004. Inv. Haygood said that he had the same concern regarding J.T.'s ability to communicate with the CAC because J.T. was younger than A.C. He confirmed that J.T. talked about Defendant and when asked where Defendant put his penis, J.T. pointed to his head and his butt. Inv. Haygood said that during the interview J.T. showed signs of a child who had

been sexually abused. The State introduced the video recording of J.T.'s interview.

Inv. Haygood testified that after the interviews with A.C. and J.T., he still did not have enough information to pursue charges against Defendant, so he continued his investigation. He contacted Defendant on the telephone and made him aware that there were allegations of sexual abuse made against him and advised Defendant to come into the Sheriff's office. Defendant told Inv. Haygood that he was on his way to Mexico to visit family. Inv. Haygood implored Defendant to come into the Sheriff's office to give a statement, and Defendant complied.

Inv. Haygood testified that Defendant confirmed he touched A.C. When asked why he touched her, Defendant stated that he had never touched a virgin before. Defendant further stated that he would often get an erection when A.C. would sit on his lap. In regards to J.T., Defendant said that J.T. burst in the bathroom while Defendant was getting out of the shower, and his penis "landed in J.T.'s mouth." Inv. Haygood asked Defendant if the previously mentioned occurrences happened with other children in the household, and Defendant responded yes. Inv. Haygood testified that charges were not brought against Defendant for the sexual abuse of J.T. J.T. spent time with Defendant in both Mississippi and Louisiana, and due to his age and lack of communication they could not determine where J.T.'s abuse had occurred. In contrast, Inv. Haygood said that because A.C. had lived in Mississippi her whole life, he did not have an issue bringing charges against Defendant for the abuse she sustained. The State introduced Defendant's audio recorded statement with Inv. Haygood into evidence and played it for the jury.

5

*A.C.*

At the time of trial, A.C. was twenty-two years old.  A.C. is J.T.'s cousin and Mrs. Coon's daughter.  A.C. testified that when she was around three or four years old, her grandmother, Ms. Cosse, got a new boyfriend[4].  A.C. used to be dropped off at Ms. Cosse's residence many times while Defendant was present.  Around four to five years old, A.C. said that she was molested by Defendant.  She said that the molestation occurred at least four to five times that she could recall.

A.C. testified that Defendant started off tongue kissing her and then it progressed.  After Defendant became more comfortable, he rubbed on A.C.'s chest and vagina.  She stated that while in bed, Defendant would pull her underwear to the side and continue to rub her.  On one occasion, Defendant took his penis and rubbed it up and down A.C.'s vagina.  She said that Defendant told her that what he was doing to her was okay, and it was their secret.  A.C. confirmed that Defendant had, indeed, masturbated and ejaculated in front of her.  She said that the sexual abuse occurred when Ms. Cosse was on the porch smoking or drinking coffee, or, if the television was really loud and Ms. Cosse was asleep, Defendant would molest her while all three of them were in the bed.  A.C. identified Defendant in the courtroom as the new husband that was at Ms. Cosse's residence when she would visit.

*Amy Tiser*

Mrs. Tiser is J.T.'s mother and Ms. Cosse's daughter.  She testified that in 2004, J.T. stayed with Ms. Cosse and Defendant at the Delta Hotel a few times each week.  She explained that before Hurricane Katrina struck in 2005, she and her family evacuated to McComb, Mississippi.  After Hurricane Katrina, Mrs.

---

[4] Ms. Cosse and Defendant were married sometime after 2005.

6

Tiser and her household relocated to Vidalia, Louisiana. Mrs. Tiser said that Defendant and Ms. Cosse remained in McComb, which was about an hour and a half from where she lived in Vidalia. Despite the distance, Mrs. Tiser and her children visited Ms. Cosse a few times a week.

In July of 2006, Mrs. Tiser testified that she dropped J.T. off to her sister, Mrs. Coon. Later that day, Mrs. Coon called her and told her to come back to her house immediately. Once Mrs. Tiser arrived, Mrs. Coon told her that the older children witnessed A.C. and J.T. playing inappropriately. This behavior caused Mrs. Tiser to question J.T. Mrs. Tiser asked J.T. did anyone touch his penis and J.T. said no, but that Defendant made J.T. touch his penis with his mouth or his hands before and that white stuff came out. J.T. communicated that this incident happened by the piano. Mrs. Tiser attested that she knew J.T. was speaking of the piano that was located at the Delta Hotel, but she cut off questioning and contacted the Sheriff's office.

Mrs. Tiser testified that Defendant pled guilty and admitted to sexually assaulting A.C. Defendant was released from prison in August of 2016. In March 2017, Ms. Cosse was in the hospital and Defendant showed up, which resulted in his arrest for violation of his parole. Mrs. Tiser told J.T. that Defendant was out of jail, and J.T. told her that he remembered everything and that he needed to immediately speak to someone in Plaquemines Parish and in Pike County. Mrs. Tiser contacted the Sheriff's Offices in both locations.

*Lieutenant Detective Holly Hardin*

Lieutenant Detective Holly Hardin ("Det. Hardin") testified that, at the time of her testimony, she was the lieutenant over the Criminal Investigation Bureau at the Plaquemines Parish Sheriff's Office. She explained that when she was

assigned to J.T.'s case in March of 2017, at that time she was a sergeant over the Special Victims Unit.  J.T. was fourteen years old when she set up a forensic interview for him, and he was three years old when the abuse occurred.  During the interview, J.T. confirmed that when he was three years old, Defendant sexually abused him.  Following the interview, Det. Hardin referred J.T. to Dr. Mehta for a medical examination.  Based on that interview, on March 21, 2017, Det. Hardin obtained an arrest warrant for Defendant for aggravated rape.

*J.T.*

At the time of his testimony, J.T. was twenty-two years old.  He testified that he is from Port Sulphur, Louisiana, which is in Plaquemines Parish.  He said that his family evacuated from Port Sulphur to Vidalia, Louisiana, during Hurricane Katrina.  After spending about a year in Vidalia, they moved to McComb, Mississippi.  In 2004, when he lived in Port Sulphur, Ms. Cosse, his grandmother, lived minutes away from him.  J.T. said that during that time Defendant lived with Ms. Cosse at the Delta Hotel.  He identified Defendant in the courtroom as the man who lived with Ms. Cosse at the time the abuse occurred.

J.T. visited Ms. Cosse a couple times a week, and it was not uncommon for him to sleep there overnight.  When J.T. visited Ms. Cosse, Defendant was present and there were many times he was left alone with Defendant.  J.T. testified that he was sexually molested and raped by Defendant more than once.  J.T. described the room where he was assaulted as a giant white room with multiple windows.  He then proceeded to describe how he was molested by Defendant:

> I was play—playing the piano as the curious child as I was, and Joseph came over to play on the piano with me. He was teaching me how to play. And then, as we were playing, my hands were following along with his, he proceeds to take my hand and his other hand and unzip his pants and take my hand and put it on his penis. And, as he's

doing that, he's stroking himself; and then he grabs me by the back of the head and puts my mouth on it and -- and then sits there and rapes me.

J.T. testified that when Defendant pushed his head down, Defendant's penis went inside of his mouth and remained there for roughly thirty seconds. He said that this was the only time Defendant molested him in Port Sulphur and that there were other incidents that happened in Mississippi. J.T. stated that Defendant told him not to tell anyone what happened and that if he did the cops would come get him and his family. J.T. described the rape that occurred in Mississippi as follows:

> I was laying down on my stomach with my hands -- my face on my hands, and I'm watching Tom and Jerry in front of TV. I'm in the living room, and he was in the kitchen behind me as he was watching me. And then the next thing I know [the defendant] jumps on top of me, pulls my pants down, puts [his] penis in me while [he's] holding me down by the back of the neck as I'm screaming; and then I blacked out.

J.T. explained that after he told his mom about the sexual abuse when he was four, he never discussed it with her again.

*Dr. Neha Mehta*

Dr. Neha Mehta ("Dr. Mehta"), who was accepted by the district court as an expert in the field of child abuse pediatrics, conducted a medical examination of J.T. on April 24, 2017. At the time of the examination, J.T. was fifteen years old. Dr. Mehta testified that part of the examination requires that the patient provide a patient history, which consists of the patient describing any physical or sexual abuse they may have experienced. Dr. Mehta further testified that J.T. described both oral and anal sexual abuse. She explained that J.T. made it clear that the abuse occurred in multiple locations. Based on the information J.T. provided to her regarding his sexual abuse, she did not expect to see any signs of physical trauma during his examination due to the passage of time. She said that once the

9

time period has passed to collect trace evidence, which is usually seventy-two hours, she expected to see a normal examination. Dr. Mehta concluded from her examination that J.T. had been sexually abused. The State introduced Dr. Mehta's medical report that was generated from her visit with J.T. along with a video recording of her interview with J.T., which it played for the jury.

Trial was concluded on October 17, 2024 and the jury found Defendant guilty of aggravated rape. At Defendant's sentencing hearing, he filed a motion for judgment of acquittal, which the district court denied. Defendant objected to the denial of his motion. The district court sentenced Defendant to life imprisonment at hard labor without benefit of probation, parole, or suspension of sentence. This timely appeal followed.

## ERRORS PATENT

An appellate court must review criminal appeal records for the existence of a patent error. *See* La. C.Cr.P. art. 920(2).[5] A careful examination of the record reveals no errors patent.

## DISCUSSION

In his sole assignment of error, Defendant argues that the State violated Defendant's right to due process by prosecuting him based on facts that were known to J.T.'s family and law enforcement in 2006. Additionally, Defendant contends that the trial evidence presented consists of testimony from the twenty-two-year-old victim recalling an incident that occurred when he was three years

---

[5] Louisiana Code of Criminal procedure article 920 provides:

The following matters and no others shall be considered on appeal:
(1) An error designated in the assignment of errors; and
(2) An error that is discoverable by a mere inspection of the pleadings and proceedings and without inspection of the evidence.

old. Although Defendant frames his argument as a due process challenge based on the State's delay in prosecution, his argument raises the sufficiency of the evidence supporting his conviction. Because a finding of insufficient evidence would warrant an acquittal, we will first address whether the evidence, viewed in light most favorable to the prosecution, was sufficient to support the conviction.

*Sufficiency of evidence*

"When reviewing the sufficiency of the evidence to support a conviction, Louisiana appellate courts are controlled by the standard enunciated in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)." *State v. Lamizana* 21-0409, p. 4 (La. App. 4 Cir. 3/23/22), 366 So.3d 416, 419 (quoting *State v. Brown*, 03-0897, p. 22 (La. 4/12/05), 907 So.2d 1, 18). "Under this standard, the appellate court 'must determine that the evidence, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime had been proved beyond a reasonable doubt.'" *Id.* (internal citation omitted). "The determination of credibility is a question of fact within the sound discretion of the trier of fact and will not be disturbed unless clearly contrary to the evidence." *State v. Barbain*, 15-0404 at p. 8 (La. App. 4 Cir. 11/4/15), 179 So.3d 770, 776 (quoting *State v. Brown,* 12–0853, p. 2 (La. App. 4 Cir. 2/6/13), 109 So.3d 966, 968). "It is not the function of the appellate court to assess the credibility of witnesses or reweigh the evidence." *Id.* at p. 8, 179 So.3d at 776-77 (quoting *State v. Richards,* 11–0349, p. 9 (La. App. 4 Cir. 12/1/11), 78 So.3d 864, 869). "In the absence of internal contradiction or an irreconcilable conflict with the physical evidence, a single witness' testimony, if believed by the fact finder, is sufficient to support a factual conclusion." *Id.* at p. 8, 179 So.3d at

777 (citing *State v. Rapp,* 14–0633, pp. 6–7 (La. App. 4 Cir. 2/18/15), 161 So.3d 103, 108).

With these precepts in mind, we now turn to the merits of this case.

*Aggravated rape*

La. R.S. 14:42 provides in pertinent part that:

A. First degree rape is a rape committed upon a person sixty-five years of age or older or where the anal, oral, or vaginal sexual intercourse is deemed to be without lawful consent of the victim because it is committed under any one or more of the following circumstances:

\* \* \*

(4) When the victim is under the age of thirteen years. Lack of knowledge of the victim's age shall not be a defense.

"In cases involving sexual offenses, the testimony of the victim alone may be sufficient to establish the elements of a sexual offense, even where the State does not introduce medical, scientific, or physical evidence to prove the commission of the offense." *Barbain*, 15-0404, p. 10 (La. App. 4 Cir. 11/4/15), 179 So.3d 770, 778 (citations omitted).

As previously mentioned, Defendant argues that J.T.'s testimony was insufficient because it could not be effectively tested due to the approximately nineteen-year delay between the offense and his testimony at trial. Conversely, the State urges that the evidence in the instant case, specifically the testimony of Dr. Mehta, demonstrates a proper justification for the delay in prosecution. We agree.

At trial, the district court heard Dr. Mehta's testimony, which explained that it is common for victims of child sexual abuse to delay disclosure of their abuse. The following colloquy occurred between the State and Dr. Mehta:

**Q:** And Doctor is it common for victims of child abuse to delay their disclosure that they have been abused?

**A:** Yes. That is the norm. Most children do not disclose in a timely fashion that they've been sexually abused.

**Q:** And can you explain for the members of the jury why is that? Why is it that children don't immediately report instances of child sexual abuse?

**A:** There's a number of reasons that we feel that children don't come forward with information. Sometimes when they're very young when something happens, they don't necessarily understand what it means. They might think that it's some kind of a game, or they – they don't understand that it's sexual in nature. They just think it's a weird bad thing that happened. As they get older, sometimes there are external reasons. That means someone from the outside, someone saying "You know, if you say something, I'll hurt you" or "I'll hurt your dog" or "you'll be the one who gets in trouble." Most commonly the reasons children don't disclose sexual abuse is it – it's really something internal. It's what they are telling themselves, which is often things related to shame, embarrassment about what's happened, feeling like "It's my fault that this happened to me. Something's wrong with me that this is happening to me," disgust for being able to -- to put into words the types of things that happened, sometimes not even having a good vocabulary to really explain what it is that happened, not really understanding it and being too embarrassed to say that.

In *State v. Hidalgo*, the defendant was charged and convicted of aggravated rape. 23-375, p. 18 (La. App. 5 Cir. 5/8/24), 389 So.3d 231, 244. The defendant argued that the sexual abuse was not reported until nearly ten years later and that corroboration is needed in such a case. *Id.* The appellate court concluded that "an explanation of why delayed reporting occurs was provided in the matter . . . Nurse Troy explained that, from her experience, most children do not want to talk about the sexual abuse they have experienced . . . [and] the jury made a credibility determination." *Id.* Analogous to *Hidalgo*, here, Dr. Mehta provided an explanation of why delayed reporting occurs and the jury made a credibility determination.

Moreover, in support of J.T.'s testimony—who was twenty-two-years-old at the time of trial—the State introduced a video recording of J.T. that was made

when he was fifteen years old, wherein he recounted the same events that are the subject of this prosecution. The district court also heard the testimony of A.C., whom Defendant had previously been convicted of abusing. In support of A.C.'s testimony, the State introduced an audio-recorded statement in which Defendant admitted to sexually abusing A.C. "As the trier of fact, the jury was free to accept or reject, in whole or in part, the testimony of any witness." *State v. Freeman*, 17-0417, p. 7 (La. App. 4 Cir. 12/29/17), 2017 WL 6629156 Unpub., at *4 (quoting *State v. Robertson*, 95-0645, p. 5, (La. App. 1 Cir. 4/4/96), 672 So.2d 391, 395. Based on a review of the totality of the evidence presented by the State, we find the evidence sufficient to prove beyond a reasonable doubt that Defendant committed aggravated rape.

*Assignment of error No.1 – Right to due process*

Defendant contends that the State violated his due process rights by delaying prosecution for approximately nineteen years after the offense occurred. Specifically, Defendant argues that the facts as outlined in this prosecution were known to J.T. and his family in 2006, and that this delay in prosecution unnecessarily and unfairly hindered his ability to prepare a defense. Defendant cites a dissent in a writ opinion, *State v. Smith*, to support his proposition that the lengthy delay of time between the offense and prosecution violated his right to due process. 01-1027, pp. 3-4 (La. App. 1 Cir. 2/15/02), 809 So.2d 556, 559 (Downing, J., concurring in part and dissenting in part).

In *Smith*, the defendant was indicted for the aggravated rape of a juvenile that took place twenty-one years prior to the indictment. The defendant filed a motion to quash the indictment in which he argued that he was denied due process of law based on the twenty-one-year delay. He further argued that defense counsel

14

would be unable to prepare a defense because of the lengthy delay. The district court denied the defendant's motion to quash the indictment, and he sought supervisory review of the district court's judgment in the court of appeal. The *Smith* Court majority held that "[defendant] made no attempt to introduce any evidence at the hearing or offer any factual allegations about how he has been actually prejudiced by the delay." *Smith,* 01-1027, p. 6, 809 So.2d at 560 (Downing, J., concurring in part and dissenting in part). The Court further stated that "[defendant] speculate[d] . . . that his attorney would not be able to test the victim's memory as to the surrounding events, such as clothing worn, time of day, exact location . . . and other factors [defendant] thinks will impact on the victim's credibility." *Id.* at p. 6, 809 So.2d at 561. The majority found no merit to the defendant's claim. To the contrary, the dissenting judge reasoned that in the absence of corroborating evidence, "a passage of time of such length that an accused is prevented from preparing a defense should be sufficient grounds to hold that due process is violated." *Id.* at p. 1, 809 So.2d at 566. Although Defendant relies on the dissenting opinion in *Smith*, the majority rejected the notion that a lengthy pre-indictment delay alone establishes a due-process violation.

Additionally, in *State v. Hughes*, the defendant was charged for the molestation of a juvenile. 94-1364, p. 1 (La. App. 4 Cir. 12/28/94), 648 So.2d 490, 491. The State filed a bill of information, which charged the defendant approximately seven years after the offense occurred. The defendant filed a motion to quash the bill of information stating that he was denied his right to due process because of the delay to prosecute. This Court held that the defendant's argument had no merit. *Id.* at p. 6, 648 So.2d at 493. The *Hughes* Court explained that "to prove a due process violation that requires dismissal of an indictment

15

because of pre-indictment delay, the defendant must show that the State deliberately delayed to gain a tactical advantage and the delay caused actual and substantial prejudice to the defendant. *Id.* This Court concluded that "defendant does not allege specific, actual prejudice, rather merely alleges general prejudice in preparation of his defense." *Id.*

Finally, in *State v. Brown* the defendant was charged and convicted for first degree murder. 16-0998 (La. 1/28/22), 347 So.3d 745. On direct appeal, the defendant argued that the district court erred in denying his motion to quash the indictment because the delay between the offense and the indictment violated his right to due process. The defendant alleged that the delay hampered defense counsel's ability to conduct a meaningful investigation or litigation. The Supreme Court explained that La. C.Cr.P. art. 571[6] does not place time limitations on the prosecution for a crime punishable by death or life imprisonment. *Brown*, 16-0998, p. 63, 347 So.3d at 797. That Court further stated "that pre-indictment delays may violate due process, and that '[t]he proper approach in determining whether an accused has been denied due process of law through a pre[-]indictment or pre-arrest delay is to measure the government's justifications for the delay against the degree of prejudice suffered by the accused.'" *Id.* at pp. 63-64, 347 So.3d at 797 (quoting *State v. Schrader*, 518 So.2d 1024, 1028 (La. 1988)).

The *Brown* Court held that the defendant failed to show any specific prejudice and "found the [S]tate's reasons for delay legitimate in light of several former prosecutors describing the circumstances causing the delay (such as the

---

[6] Louisiana Code of Criminal Procedure art. 571 provides:

 There is no time limitation upon the institution of prosecution for any crime for which the punishment may be death or life imprisonment or for the crime of forcible or second degree rape (R.S. 14:42.1) or molestation of a juvenile or a person with a physical or mental disability (R.S. 14:81.2).

complex, sprawling nature of the case involving voluminous DNA evidence and the fact that all defendants were serving life sentences)." *Brown*, 16-0998, p. 64, 347 So.3d at 797. The Supreme Court concluded that "whatever prejudice may have been suffered appears to be outweighed by the state's justifications . . . [t]he [district] court did not err in denying the motion to quash the indictment." *Id.* at p. 65, 347 So.3d at 797.

In the instant case, unlike the defendants in *Smith, Hughes* and *Brown*, Defendant did not file a motion to quash the indictment. Moreover, Defendant failed to introduce any evidence or offer any factual allegations about how he may have suffered actual prejudice at the district court. Rather, Defendant alleges general prejudice in preparation of his defense, which is merely speculative and does not demonstrate actual prejudice. General allegations of prejudice in the preparation of the defense and allegations of "potential" prejudice are not sufficient to support a due process violation based on a lengthy pre-indictment delay alone. *Smith*, 01-1027, p. 6, 809 So.2d at 561. Applying these principles, this Court finds that regardless of the State's justification for the delay in prosecution, Defendant has failed to meet his burden of establishing prejudice from the delay. This assignment of error is unpersuasive.

## CONCLUSION

For the foregoing reasons, we affirm Defendant's conviction and sentence for aggravated rape.

**AFFIRMED**